ABBOTT LABORATORIES, Plaintiff,

v.

Dr. Frank E. YOUNG, Commissioner, Food and Drug Administration, Defendant.

Civ. A. No. 88–0474–OG.

United States District Court, District of Columbia.

July 25, 1988.

Harold Murry, Bryan Yolles, and Robert Reznick of Clifford & Warnke, Washington, D.C., for plaintiff.

Jacqueline Eagle, Dept. of Justice, Washington, D.C., Jeffrey Freedman, Food and Drug Administration, Rockville, Md., for defendant.

**MEMORANDUM**

GASCH, District Judge.

Aggrieved by certain informal action taken by the Food and Drug Administration ("FDA" or "Agency"), plaintiff Abbott Laboratories ("Abbott") seeks *de novo* review of the Agency's factual findings and declaratory and injunctive relief reversing the Agency's resolution of pertinent legal issues. Abbott seeks this judicial review under the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 701–706. The focus of the factual and legal disputes is the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, as amended by the Drug Price Competition and Patent Term Restoration Act, Pub.L. No. 98–417, § 101, 98 Stat. 1585 (1984) (codified at 21 U.S.C. § 355) which are commonly referred to as the Hatch–Waxman Amendments.

I. BACKGROUND

On February 28, 1978, the FDA approved a new drug application submitted by Abbott for the drug Depakene, an anticonvulsant drug indicated for patients, including

epileptics, who suffer various kinds of seizures. The therapeutic ingredient in Depakene is valproic acid, and the drug is administered as a syrup or a soft-gelatin tablet. Taken in this form, the drug frequently causes gastrointestinal side-effects.

In 1981, Abbott began investigating a new anticonvulsant drug, Depakote, that is formulated as a specially coated tablet. In this form, the drug does not dissolve in the stomach and does not cause the undesirable side-effects common with Depakene. In order to develop this improved anticonvulsant, Abbott replaced valproic acid—the ingredient in Depakene—with divalproex sodium. When this chemical enters the digestive system it is converted into valproic acid. *See* Depakote New Drug Application, *reproduced in* Administrative Record at 314 [hereinafter A.R.]. Thus, Depakote achieves the same pharmaceutical effect as Depakene.

Later in 1981, Abbott submitted a new drug application for Depakote ("Depakote NDA"). Because the pharmaceutically active chemical in Depakote is identical to that in Depakene, Abbott requested that the FDA refer to the Depakene application for the required clinical studies of safety and efficacy. Letter from A.G. Ramsay, Abbott Laboratories, to Bureau of Drugs (Dec. 29, 1981) (transmitting Depakote NDA), *reproduced in* A.R. at 310; Depakote New Drug Application, *reproduced in* A.R. at 321–324. The primary clinical studies conducted by Abbott were simply to demonstrate that recommended dosages of Depakote did yield biologically equivalent amounts of Depakene's active ingredient, valproic acid. Abbott successfully demonstrated the therapeutic equivalence of Depakote and Depakene, and the Depakote NDA was approved on March 10, 1983. *See* Letter from Robert J. Temple, M.D., National Center for Drugs and Biologics, to E.B. Chappell, Abbott Laboratories (March 10, 1983), *reproduced in* A.R. at 294.

One and one-half years after Depakote received FDA approval, Congress enacted the Hatch–Waxman Amendments. Among the purposes of the Amendments was the enhancement of competition in the drug industry through abbreviated procedures for the approval of generic copies of approved drugs. *See Mead Johnson Pharmaceutical Group v. Bowen,* 838 F.2d 1332, 1333 (D.C.Cir.1988); *see also* H.R. REP. No. 98–857, 98th Cong., 2d Sess., pt. 1, at 14–15, *reprinted in* 1984 U.S.CODE CONG. & ADMIN.NEWS 2647, 2647–48 [hereinafter H.R.REP. No. 98–857]. These procedures substantially shorten the time and expense incurred by drug manufacturers to obtain FDA approval of generic drugs. To protect the research and development investments of the pioneer drug industry, however, the Amendments also entitle various categories of drugs that are approved through the NDA process, 21 U.S.C. § 355(b), to exclusive marketing periods regardless of patent protection. This privilege "protects products whose development has taken much time and money in FDA testing and review, but which have little [or] no patent life left when they are finally allowed on the market." 130 CONG.REC. S10504 (Aug. 10, 1984) (statement of Sen. Hatch) [hereinafter Hatch Statement]. During the exclusive marketing period, no abbreviated new drug application ("ANDA") may be approved for a generic copy of the NDA-approved drug. 21 U.S.C. § 355(j)(4)(D); *see* Hatch Statement, 130 CONG.REC. S10504; 130 CONG.REC. H9113–14 (Sept. 6, 1984) (statement of Rep. Waxman) [hereinafter Waxman Statement].

Following passage of the Hatch–Waxman Amendments, Abbott submitted "Patent and Exclusivity Information" for divalproex sodium, the active ingredient in the final dosage form of Depakote.[1] Letter from Martin L. Katz, Abbott Laboratories, to Thomas J. McGinnis, Food and Drug Administration (Oct. 23, 1984), *reproduced in* A.R. at 19–20. Abbott declared that divalproex sodium is entitled to ten years of exclusive marketing from March 10, 1983. Without further communication be-

---

1. The final dosage form of a drug is the form in which it appears prior to administration to the patient. Depakote is a tablet that contains divalproex sodium.

tween the parties, FDA determined that the drug may be marketed exclusively by Abbott only for two years from the date of enactment of the Amendments—September 24, 1984. CENTER FOR DRUGS AND BIOLOGICS, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, APPROVED DRUG PRODUCTS (6th ed. 1985) (complaint Ex. B) [hereinafter AP-PROVED DRUG PRODUCTS].

After Abbott objected to this designation, Letter from Michael Nelson, Abbott Laboratories, to Thomas J. McGinnis (July 10, 1986), *reproduced in* A.R. at 22–26, FDA affirmed its decision and suggested that Abbott might pursue its dissatisfaction by filing a citizen petition with the Commissioner of the FDA. Letter from Thomas J. McGinnis to Michael Nelson (Aug. 12, 1986), *reproduced in* A.R. at 27–28. Abbott heeded this advice and submitted such a petition, pursuant to 21 C.F.R. § 10.30, on August 29, 1986. In the petition, Abbott requested "a ruling that [its] drug product, DEPAKOTE (divalproex sodium), can be marketed exclusively by the Company for ten years from ... March 10, 1983." [2] Citizen Petition, Docket Number 86P–0367/CP (Aug. 29, 1986), *reproduced in* A.R. at 1 *et seq.* [hereinafter Citizen Petition]. The basis for Abbott's contention was one of two exclusive marketing provisions at issue in this case:

If an application (other than an abbreviated new drug application) submitted under subsection (b) for a drug, no active ingredient (including any ester or salt of the active ingredient) of which has been approved in any other application under subsection (b), was approved during the

**2.** Pursuant to 21 C.F.R. § 10.35, Abbott also petitioned the Agency for a stay of approval of any abbreviated new drug applications requesting permission to market generic copies of Depakote. Petition for Stay of Action (Aug. 29, 1986), *reproduced in* A.R. at 66–74.

**3.** The extraordinarily dense language of this statute is parsed and explained below.

**4.** In its citizen petition, as supplemented, Abbott cited a variety of scientific tests regarding the chemical and physical properties of divalproex sodium. The purpose of the tests was to demonstrate that divalproex sodium is a chemical entity distinct from valproic acid, the active ingredient in Depakene, and sodium valproate,

period beginning January 1, 1982, and ending on the date of the date of enactment of this subsection [September 24, 1984], the Secretary may not make the approval of an application submitted under this subsection which refers to the drug for which the subsection (b) application was submitted effective before the expiration of ten years from the date of the approval of the application under subsection (b).

21 U.S.C. § 355(j)(4)(D)(i).[3] Abbott argued that the term "active ingredient" refers to the ingredient in the "final dosage form of the product ... not the form the ingredient might take upon administration to the patient." Letter from Bryan Yolles, Counsel for Abbott Laboratories, to Ann Witt, Food and Drug Administration (Feb. 27, 1987), *reproduced in* A.R. at 139A–F. Based upon this interpretation of the statute, the company insisted that the "active ingredient" in Depakote is divalproex sodium and that neither this chemical nor a salt or ester of this chemical had previously been approved under the NDA procedures of section 355(b).[4] Accordingly, Abbott concluded that Depakote qualifies for ten years of exclusive marketing under section 355(j)(4)(D)(i).

In a decision rendered February 11, 1988, the FDA denied Abbott's petition. Letter from John M. Taylor, Associate Commissioner for Regulatory Affairs, to Bryan J. Yolles, *reproduced in* A.R. at 192 [hereinafter Agency Decision].[5] The foundation of the Agency's decision was the factual finding that divalproex sodium is "simply a

the sodium salt of valproic acid. The company further argued that if divalproex sodium were a salt, it would be the salt of divalproic acid which had never previously been approved by the FDA. *See* Citizen Petition, A.R. at 14. Abbott also challenged the FDA's conclusions that divalproex sodium is a salt and that it is nothing more than a combination of valproic acid and sodium valproate. Second Supplement to Citizen Petition (Feb. 5, 1987), *reproduced in* A.R. at 115, 116, 119–122.

**5.** The Agency contemporaneously denied Abbott's request for a stay of approval of ANDA's submitted for generic copies of Depakote. Agency Decision, A.R. at 193.

salt of valproic acid." *Id.* at 2, A.R. at 194. The agency relied upon the "standard definition of salt," the "official rules of nomenclature for chemical compounds," and the affidavit of Dr. Robert H. Wood, a professor of chemistry at the University of Delaware. In Dr. Wood's view, the problem is one of nomenclature, and the rules applicable to salts classify divalproex sodium as a salt of valproic acid. *See* Affidavit of Robert H. Wood, PhD. ¶¶ 3–5, Exhibit A to Agency Decision, *reproduced in* A.R. at 213–15. The doctor rejected Abbott's attempts to distinguish divalproex sodium from other salts based on various physical and chemical properties of the substance. *Id.* ¶¶ 6–14, A.R. at 215–19.

The FDA further reasoned that the congressional policy underlying the ten-year exclusive marketing provision is not served by qualifying Depakote under this provision because Abbott did not perform the extensive clinical studies for safety and efficacy usually required of NDA applicants. Instead, the Agency accepted the company's assertion in the Depakote NDA that the pharmaceutically active component of the drug—valproic acid—is identical to that found in Depakene. Thus, Abbott did not make the investment in time or money contemplated by Congress when it determined to include the exclusive marketing provisions in the Hatch–Waxman Amendments. *See* Agency Decision at 11–14, A.R. at 202–05.

Finally, the FDA rejected Abbott's definition of "active ingredient" as referring to the ingredient in the final dosage form of the drug. Rather, the Agency concluded that as used in sections 355(j)(4)(D)(i)–(v), "active ingredient" refers to the pharmaceutically active component (active moiety) of the drug. The active moiety in both Depakote and Depakene is valproic acid. The FDA relied on its perception of legislative policy underlying the exclusivity provisions to distinguish a broader definition of "active ingredient" applied as the term is used in section 355(j)(2)(A)(ii) which defines the types of drugs that are eligible for the abbreviated approval procedures. *Id.* at 14–16, A.R. at 205–07.

The Agency concluded that section 355(j)(4)(D)(v), a subsection of the exclusivity provisions not referenced by Abbott, requires that Depakote receive only two years of protection from competition from generic substitutes. That subsection states:

> If an application (or supplement to an application) submitted under subsection (b) for a drug, which includes an active ingredient (including any ester or salt of the active ingredient) that has been approved in another application under subsection (b), was approved during the period beginning January 1, 1982, and ending on the date of the enactment of this subsection [September 24, 1984], the Secretary may not make the approval of an application submitted under this subsection which refers to the drug for which the subsection (b) application was submitted ... before the expiration of two years from the date of enactment of this subsection [September 24, 1984].

21 U.S.C. § 355(j)(4)(D)(v). Because the FDA concluded that the active ingredient in Depakote is valproic acid, which had previously been approved as an active ingredient in Depakene, it determined that Depakote was entitled only to two years of exclusivity.

## II. DISCUSSION

On its face, the parties dispute raises a novel issue of statutory interpretation of the exclusivity provisions of the Hatch–Waxman Amendments. An undercurrent of argument focuses on the standards of review applicable under the APA to the FDA's interpretation of these provisions. A threshold issue, however, is presented by Abbott's complaint that the Agency relied heavily on evidence regarding which Abbott was not permitted an opportunity to comment.

### A. *Abbott's Right To Comment Upon The Affidavit Of Dr. Robert H. Wood*

In response to a request from the FDA's Center for Drugs and Biologics, Abbott supplemented its citizen petition in February 1987 with evidence and analysis pur-

porting to demonstrate that divalproex sodium is not a salt. Second Supplement to Citizen Petition (Feb. 5, 1987), *reproduced in* A.R. at 115. The supplement consisted of scientific data and an analysis of that data. Additionally, Abbott submitted affidavits of professors of Chemistry at Northwestern University and Purdue University. Exhibit C to Plaintiff's Cross–Motion for Summary Judgment [hereinafter Plaintiff's Cross–Motion].[6] From these data and affidavits, Abbott argued that divalproex sodium exhibits substantially different properties from valproic acid and sodium valproate. Exhibit A to Second Supplement to Citizen Petition, *reproduced in* A.R. at 119, 121. Moreover, Abbott's experts opined that the physical characteristics of divalproex sodium preclude categorization of the drug as a salt. Affidavit of Dr. Joseph B. Lambert ¶¶ 2–5 [hereinafter Lambert Affidavit]; Affidavit of Dr. Stephen R. Byrn ¶¶ 5–6 [hereinafter Byrn Affidavit].

Sometime after these submissions, the FDA solicited a rebuttal affidavit from Dr. Robert H. Wood. The affidavit addresses the categorization of divalproex sodium as an issue of nomenclature. Wood Affidavit ¶¶ 3–4, A.R. at 213–14. Based on the chemical structure of the drug, Dr. Wood concluded that according to well-accepted conventions of nomenclature, divalproex sodium is an acid salt of valproic acid. *Id.* ¶¶ 5–6, A.R. at 214–15. After reaching this conclusion, Dr. Wood considered Abbott's arguments regarding the physical properties of the drug. He asserted that these properties—high molecular weight, oligomeric structure, solubility, and low melting point—are irrelevant to the categorization of divalproex sodium as a salt. *Id.* ¶¶ 6, 9–14, A.R. 215–19.

In its reply in support of its cross-motion for summary judgment, Abbott complains that the affidavit of Dr. Wood was hidden from the company's scrutiny, though heavily relied upon by the FDA. Citing the notice and comment requirements of infor-

mal rule-making, 5 U.S.C. § 553(c), Abbott argues that the Agency's procedures were defective. Specifically, the company insists that it was entitled to an opportunity to controvert Dr. Wood's opinion.

■ While an agency is required to disclose files or reports it deems relevant to the proceeding, *U.S. Lines, Inc. v. Federal Maritime Commission*, 584 F.2d 519, 534 (D.C.Cir.1978), the process of agency fact-finding and deliberation cannot be interminable. The purpose of this disclosure requirement is to ensure that interested parties have a meaningful opportunity to participate in agency proceedings, *id.*, and that the Court has an adequate record from which to determine whether the agency properly performed its functions. *See Portland Cement Association v. Ruckelshaus*, 486 F.2d 375, 393–94 (D.C.Cir.1973).

■ At the request of the FDA, Abbott submitted scientific data and expert opinion regarding the classification of divalproex sodium. Without collecting any additional data, the Agency solicited an additional expert opinion that refutes the conclusion of Abbott's experts. Abbott would have the Court rule that the FDA was obliged to permit the company to submit additional expert opinion regarding the nomenclature rules applicable to divalproex sodium. Neither *U.S. Lines* nor *Portland Cement* supports such a demand.

The Agency's request for additional information contemplated "evidence that [di]valproic acid exists as a chemical entity distinct from valproic acid; and ... information on the properties of related substances having ratios of valproic acid to such metals as sodium, potassium, and calcium." Letter from Ann M. Witt to Bryan Yolles (Jan. 16, 1987), *reproduced in* A.R. at 114. In response, Abbott submitted data and a memorandum purporting to demonstrate that divalproex sodium "is a chemical entity distinct from valproic or sodium valproate; is not a combination or

---

**6.** Although the affidavits are not found in the administrative record submitted to the Court, Abbott contends that the affidavits and curriculum vitae of the affiants were delivered to the

FDA on February 11, 1987 and were accidentally omitted from the administrative record. FDA does not dispute this contention.

mixture of valproic acid and sodium valproate; and is not a salt; and specifically not a salt of valproic acid." Second Supplement, A.R. at 116; *see* Lambert Affidavit; Byrn Affidavit. The Wood affidavit simply offered an opinion that divalproex sodium is a salt of valproic acid. The opinion was based on conventions of nomenclature well-known to Abbott's experts.

Neither fairness nor the needs of the reviewing Court required that Abbott be allowed to submit further opinion to which the FDA would inevitably desire to respond. Because the Agency did not abrogate procedural requirements, *de novo* review by the Court would be inappropriate. *See Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 284–85 (D.C.Cir.1981). Similarly, remand to the Agency is not required unless the Court finds that the factual finding—that divalproex sodium is a salt of valproic acid—was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971) (judicial review of informal rulemaking is conducted under section 706(2)(A)).[7]

B. *The FDA's Finding That Divalproex Sodium Is A Salt Of Valproic Acid Was Not Arbitrary And Capricious*

While the parties agree in principle that judicial review in this case must be conducted under the "arbitrary and capricious" standard, their elaboration of that standard varies markedly. It is well-settled, however, that "[t]he scope of review ... is narrow and a court is not to substitute its judgment for that of the agency.... [T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found

and the choice made.'" *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *see Eagle–Picher Industries v. E.P.A.,* 759 F.2d 905, 921 (D.C.Cir.1985). Much deference is accorded the agency, and its action is presumed to be valid. *See United Transportation Union v. Lewis,* 711 F.2d 233, 252 (D.C.Cir.1983) (citing *Overton Park,* 401 U.S. at 415, 91 S.Ct. at 823). Deference is particularly advised when the administrative action is based on the expertise of the agency. *See Baltimore Gas and Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983); *Community Nutrition Institute v. Young,* 773 F.2d 1356, 1363 (D.C. Cir.1985) ("court will not substitute its judgment on highly technical and factual matters for that of the [FDA which is] charged with the supervision of the industry"). Nevertheless, the Court's inquiry into the administrative record must be "'searching and careful' ... to ensure that the agency's decision was a product of reasoned decisionmaking based upon a consideration of relevant factors." *Motor Vehicle Manufacturers Association v. E.P.A.,* 768 F.2d 385, 389 n. 6 (D.C.Cir. 1985) (citing *Small Refiner Lead Phase-Down Task Force v. E.P.A.,* 705 F.2d 506, 520 (D.C.Cir.1983)).

The FDA's determination that divalproex sodium is a salt of valproic acid falls well within the bounds of reasoned decisionmaking. The Agency was presented with authoritative but conflicting opinions regarding the appropriate basis for classification of salts. After considering the distinctions drawn by Abbott's experts, the FDA reasonably concluded that classification should be based on known standards of nomenclature. At the same time, it not-

---

**7.** Abbott's complaint also suggests that the FDA's action on the citizen petition was "short of statutory right," 5 U.S.C. § 706(2)(C). Complaint ¶ 26. Abbott cites no provision of the Hatch–Waxman Amendments that limits the power of the FDA to make factual findings essential to determining the duration of marketing exclusivity to which a drug is entitled. Pre-

sumably, Abbott is referring to its contention that section 355(j)(4)(D)(i) authorizes ten years of exclusivity for Depakote. If Abbott is correct, the Agency's conclusion to the contrary will have been contrary to law. Thus, the standard set forth in section 706(2)(C) is in this case duplicative of that stated in section 706(2)(A).

ed that Abbott's attempt to exclude divalproex sodium from classification as a salt was based on physical properties of the drug that are irrelevant to classification. Agency Decision at 6, A.R. at 197. Further, the Agency reasonably declined to adopt Abbott's method for classifying salts because it was not based on any definition of salt but a weighing of the similarities of a drug to "typical salts." *Id.* Such a method would be far less predictable and manageable than the nomenclature method. Accordingly, the Court declines to second-guess the scientific expertise of the FDA and concludes that the Agency's classification of divalproex sodium as a salt was not arbitrary or capricious.

### C. *The FDA's Definition Of "Active Ingredient" As Used In Section 355(j)(4) Of The Hatch–Waxman Amendments*

Essential to application of the marketing exclusivity provisions of the Hatch–Waxman Amendments is the definition of the term "active ingredient." Abbott argues that the term refers to the ingredient as it exists in the final dosage form of the product; that is, the form the product takes prior to ingestion by the patient. Letter from Bryan Yolles, Counsel for Abbott Laboratories, to Ann Witt, Food and Drug Administration (Feb. 27, 1987), *reproduced in* A.R. at 139A–F. Conversely, the FDA has stated that it believes the term applies to the pharmaceutically active ingredient (active moiety) of the drug.

In this case, the dispute is whether the active ingredient is divalproex sodium—the ingredient that appears in the final dosage form of depakote—or valproic acid—the chemical that yields the therapeutic effect. The disagreement is material to application of the marketing exclusivity provisions of the Amendments. As the discussion below explains, Abbott's definition leads to irreconcilable results while the FDA's definition is inconsistent with a definition assigned to the same term as used in section 355(j)(2).

The marketing exclusivity provisions at issue in this case are an element of a coordinated legislative effort to streamline administrative procedures for the approval of generic drugs. *See Mead Johnson,* 838 F.2d at 1333; H.R.REP. No. 98–857 at 14–15, 1984 U.S.CODE CONG. & ADMIN.NEWS at 2647–48. To qualify for the abbreviated new drug application process, a drug must have the same active ingredients as the drug of which it is a copy. 21 U.S.C. §§ 355(j)(2)(A)(ii) & (j)(2)(A)(iii). On several occasions, the FDA has determined a drug to be ineligible for the ANDA process because this requirement was not satisfied. In making this determination, the Agency has stated that "[t]he term active ingredient in the Act refers to the active ingredient *found in the final dosage form prior to the administration of [the] product to the patient,* rather than to any resultant form the drug may take following administration." Letter from Dr. Peter H. Rheinstein, Center for Drugs and Biologics, to I.R. Berry, Pharmacaps, Inc. (Feb. 13, 1986) (emphasis added), *reproduced in* A.R. at 30; Letter from Dr. Peter H. Rheinstein to George W. Severn, Rowell Laboratories, Inc. (June 5, 1986), *reproduced in* A.R. at 36. Abbott asserts that the same definition should apply to the term as used in sections 355(j)(4)(D)(i)–(v). The FDA disagrees.

In its decision denying Abbott's citizen petition, the FDA stated:

> Abbott's interpretation is [not] consistent with Congressional intent, nor is it mandated by FDA's interpretation of "same active ingredient" for purposes of permitting the marketing of new drug products through abbreviated applications. This interpretation of "same active ingredient" is inapplicable to the agency's determination of the period of exclusivity for which Depakote qualifies, on two independent grounds. First, as already explained, Depakote is a salt of an already approved active ingredient and thus does not fall within the plain language of eligibility for the exclusivity provisions at issue. Second, neither the language of, nor the policies underlying, the exclusivity provisions are the same as those of the ANDA eligibility provisions in section 505(j)(2)(C).

Agency Decision at 14–15, A.R. at 205–06. The first of the Agency's "grounds" for adopting an inconsistent definition of "active ingredient" defies understanding. At best, the explanation simply begs one of the legal issues about which the parties disagree. The second ground recites fundamental principles of statutory interpretation.

Because definition of "active ingredient" demands interpretation of the Hatch–Waxman Amendments, the first question is "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984).

> If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines that Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842–43, 104 S.Ct. at 2781–82 (footnotes omitted). As with the arbitrary and capricious standard, deference to the agency is appropriate, and "[t]he agency's construction is adequate if it falls within the permissible range of interpretations." *Office of Consumers' Counsel v. F.E.R.C.*, 783 F.2d 206, 218 (D.C.Cir.1986).

Following *Chevron U.S.A.*, the Court notes that neither the Amendments nor the legislative history reveals any congressional desire to imbue with contradictory meaning the term "active ingredient" as used in the abbreviated new drug application, 21 U.S.C. § 355(j)(2)(A), and exclusive marketing provisions, *id.* § 355(j)(4)(D), of the

Amendments. Thus, in the context of this case, the inquiry is whether the FDA reasonably offers contradictory definitions of "active ingredient" for two subsections of the same section of the Hatch–Waxman Amendments. The Agency argues that the contradictory definitions are necessary to fulfill the distinct purposes of the two subsections. As used in the ANDA subsection, "active ingredient" must be construed narrowly to ensure that the abbreviated approval procedures are not applied to drugs that are not truly the same as previously approved drugs. With respect to the exclusive marketing subsection, however, the Agency perceives a congressional intent to define broadly the term "active ingredient" in order to restrict the exclusive marketing privilege to those drugs that are genuinely new chemical entities.

■ Although the FDA may state a logical policy for the application of the subsections at issue, that policy is entirely an invention of the Agency. Moreover, it does not reflect a judgment based on the expertise of the Agency; instead, it is a uniquely legislative evaluation of the benefit of increased availability of generic drugs and the need for continued research for the development of pioneer drugs. Both subsections are part of a coordinated scheme designed to foster these competing interests. Rather than being different, their purposes are complementary. In the absence of an express congressional statement or other evidence of congressional purpose, the Agency's diametrically conflicting interpretations of "active ingredient" cannot be accepted. *See Barnson v. U.S.*, 816 F.2d 549, 554 (10th Cir.1987); *Firestone v. Howerton*, 671 F.2d 317, 320 (9th Cir.1982); *cf. Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 461, n. 230 (D.C. Cir.1976) (same term in civil and criminal sections given different meaning because civil section had no punitive purpose). Such statutory construction simply is unreasonable.[8]

---

**8.** The FDA's narrow definition of "active ingredient" as used in the ANDA provision is also inconsistent with Congress' decision to reject a definition that required identity between the ingredients in the generic drug and the drug being copied.

Some have suggested that a generic drug must be identical in all respects to the listed drug

Given this disposition of the FDA's conflicting definitions of "active ingredient," the question necessarily arises whether the definition espoused in the Agency's ANDA opinions will prevail or the broader definition proffered in this case will be adopted. Although the Court cannot be certain which the FDA will prefer, the choice is irrelevant in this case.

D. *Regardless Of The Definition Of Active Ingredient, Depakote Is Entitled To Two Years Of Marketing Exclusivity*

■ With the several peripheral and threshold issues resolved, the Court turns to the focus of the parties' arguments—the exclusive marketing provisions. Simply stated, the question is whether subsection (i) or subsection (v) of 21 U.S.C. § 355(j)(4)(D) applies to Abbott's product Depakote. Subsection (i) provides:

If an application (other than an abbreviated new drug application) submitted under subsection (b) for a drug, no active ingredient (including any ester or salt of the active ingredient) of which has been approved in any other application under subsection (b), was approved during the period beginning January 1, 1982, and ending on the date of the date of enactment of this subsection [September 24, 1984], the Secretary may not make the approval of an application submitted under this subsection which refers to the drug for which the subsection (b) application was submitted effective before the expiration of ten years from the date of the approval of the application under subsection (b).

instead of the same. The regulations that permit ANDA's for pre-1962 pioneer drugs make no such distinction. In rejecting the use of the term identical, the FDA regulation comments that "identical means a product that is the same in dosage form, strength, and route of administration, contains the same active ingredient, and is recommended for use under the same conditions of use." The Committee has adopted the FDA's policy of utilizing the term "same".... H.R.REP. No. 98–857, at 21, 1984 U.S.CODE CONG. & ADMIN.NEWS at 2654 (footnotes omitted).

Recast in comprehensible language, this subsection provides that a drug that was approved between January 1, 1982 and September 24, 1984 by the FDA pursuant to the complete new drug application procedure is entitled to ten years of protection from competition by generic copies if neither the active ingredient of that drug, the salt of the active ingredient, nor the ester of the active ingredient had previously been approved by the FDA. Abbott asserts that its new drug Depakote has divalproex sodium as its active ingredient and that neither this ingredient, a salt of it, nor an ester of it had previously been approved by the FDA.[9] The FDA contends that the active ingredient in Depakote is valproic acid. As Abbott admits, valproic acid is the active ingredient in Depakene which was approved by the FDA approximately two years before Depakote. If the Agency is correct, subsection (i) does not apply to Depakote, and Abbott is not entitled to ten years of exclusive marketing of Depakote.

The other subsection of the exclusive marketing provisions that is implicated by the parties' dispute is subsection (v) which states:

If an application (or supplement to an application) submitted under subsection (b) for a drug, which includes an active ingredient (including any ester or salt of the active ingredient) that has been approved in another application under subsection (b), was approved the period beginning January 1, 1982, and ending on the date of the enactment of this subsection [September 24, 1984], the Secretary may not make the approval of an application submitted under this subsection which refers to the drug for which the subsection (b) application was submitted

9. The Court is disquieted with this argument given the conclusion above that divalproex sodium is a salt of valproic acid. This fact, however, is irrelevant to application of subsection (i). The question under this subsection is whether the active ingredient or a salt or ester of it had previously been approved, not whether the active ingredient is a salt or ester of a previously approved drug. Though this construction of the subsection seems incomplete, the plain language of the statute allows no other.

... before the expiration of two years from the date of enactment of this subsection [September 24, 1984].

Restated, the subsection allowed exclusive marketing until September 24, 1986 to a drug that was approved pursuant to the complete new drug application process and that contains an active ingredient or the salt or ester of an active ingredient that had previously been approved by the FDA. Assuming, as Abbott would like, that divalproex sodium is the active ingredient in Depakote, subsection (v) requires that the drug receive only two years of exclusive marketing rights because divalproex sodium is a salt of valproic acid. As noted above, however, when subsection (i) is applied with divalproex sodium as the active ingredient, Depakote is entitled to ten years of exclusive marketing. Thus, if Abbott is correct that divalproex sodium is the active ingredient in Depakote, an irreconcilable statutory conflict arises.

The FDA's identification of valproic acid as the active ingredient of Depakote avoids this conflict. As already noted, subsection (i) does not apply to Depakote if its active ingredient is deemed to be valproic acid. Subsection (v), however, would apply because Depakote was approved under the complete new drug application process between January 1, 1982 and September 24, 1984 and valproic acid is also the active ingredient in Depakene which was approved before Depakote. It is an axiom of statutory interpretation that the Court should snatch consistency from the jaws of contradiction if Congress' purpose can be discerned. *See Atwell v. Merit Systems Protection Board,* 670 F.2d 272, 286 (D.C. Cir.1981); *Citizens to Save Spencer County v. E.P.A.,* 600 F.2d 844, 870 (D.C.Cir. 1979). The FDA's equation of "active ingredient" and "active moiety" achieves this end, leaving Depakote with no exclusive

marketing privilege beyond September 24, 1986.

Even if Abbott's interpretation of "active ingredient" were accepted by the FDA, the same rules of statutory interpretation would require that subsection (v) be applied to Depakote. The evident purpose of the marketing exclusivity provisions is to reward drug manufacturers for substantial expenditures of time and money for the development of pioneer drugs. In the course of defending the Amendments, Representative Waxman stated:

We clarified the language [of the Amendments] ... so that the 3–year provision will apply only when a substantial investment is made in new clinical trials.

. . . .

It would be fine to say that the consumer could get the same drug at a lower price if there were generics of the new drug. But there would not be a new drug to copy if the first company did not put in the money to develop it. What we are saying is if they put the money in to develop it, they ought to have a 3–year protection. We have narrowed it to make sure that it is a significant-enough change so that the 3–year rule will apply only when new clinical tests are essential to getting FDA approval and when there is an investment of some magnitude.

Waxman Statement, 130 Cong.Rec. at H9124.[10] Describing the Amendments to his colleagues, Representative Waxman also noted:

[T]he amendment provides a 5–year period of exclusive market life for drugs approved for the first time after enactment of the legislation. This provision will give the drug industry the incentives needed to develop new chemical entities whose therapeutic usefulness is discovered late when little or no patent life remains.

10. In this statement, the Representative was referring to subsection (ii) of the exclusivity provisions:

If an application submitted under subsection (b) for a drug, no active ingredient (including ester or salt of the active ingredient) of which has been approved in any other application under subsection (b), is approved after the

date of the enactment of this subsection [September 24, 1984], no application may be submitted under this subsection which refers to the drug for which the subsection (b) application was submitted before the expiration five years from the date of the approval of the application under subsection (b)....

21 U.S.C. § 355(j)(4)(D)(ii).

*Id.,* 130 Cong.Rec. at H9113.[11] Because Abbott was not required to perform clinical tests for safety and efficacy in support of its NDA for Depakote, it did not make the investment contemplated by Congress as justification for the longer periods of marketing exclusivity. Consequently, the Court is constrained to resolve the conflict between subsections (i) and (v) in favor of application of the latter, and either definition of "active ingredient" permits only that Depakote's exclusive marketing privilege expired on September 24, 1986.

## III. CONCLUSION

Although the FDA rejected Abbott's citizen petition in reliance upon expert opinion not disclosed to Abbott, the opinion was based upon scientific data compiled and presented by Abbott and was solicited by the Agency in response to expert opinion submitted by Abbott. Because Abbott was fully aware that classification of Depakote as a salt of Depakene was a critical issue in its petition and Abbott had a complete opportunity to comment on this issue, the Agency's failure to disclose an opinion contrary to Abbott's position does not warrant *de novo* review by the Court or remand to the Agency. Further, the Agency's finding that Depakote is a salt of Depakene was a reasonable resolution of conflicting evidence.

The same cannot be said, however, of the Agency's legal conclusion that the term "active ingredient" must be read as "active moiety" for the purposes of the exclusivity provisions of the Hatch–Waxman Amendments but given a contradictory definition in the ANDA provisions of the Amendments. Though the reasoning of the FDA is plausible, it finds no support in the language of the statute or the legislative history and is inconsistent with the complementary nature of the two portions of the Amendments. In the absence of congressional direction to the contrary, whether express or implied, the term must be given the same meaning throughout section 355(j).

Whichever definition is assigned, the result in this case is unfavorable to Abbott. If "active ingredient" is read as "active moiety," section 355(j)(4)(D)(v) unquestionably applies to Depakote, leaving the drug without exclusive marketing privileges after September 24, 1986. The same result flows from definition of the term as the ingredient in the final dosage form of the drug. While subsection (i), which allows ten years of exclusive marketing, is applicable to Depakote using this definition, subsection (v) is also applicable. The conflict is resolved by reference to the purpose of the Hatch–Waxman Amendments; namely, to preclude for a specified period generic competition against drugs as to which substantial investments had been made in clinical investigations. Because Depakote was approved entirely upon the clinical investigations conducted for Depakene, Congress' purpose is served only by restricting Depakote to two years of exclusive marketing.

---

**11.** The statutory reference for this statement is subsections (iii) and (iv) of the exclusivity provisions:

> If an application submitted under subsection (b) for a drug, which includes an active ingredient (including any ester or salt of the active ingredient) that has been approved in another application approved under subsection (b), is approved after the date of enactment of this subsection [September 24, 1984] and if such application contains reports of new clinical investigations (other than bioavailability studies) essential to the approval of the application and conducted or sponsored by the applicant, the Secretary may not make the approval of an application submitted under this subsection for the conditions of approval of such drug in the subsection (b) application effective before the expiration of three years from

> the date of the approval of the application under subsection (b) for such drug.

21 U.S.C. § 355(j)(4)(D)(iii).

> If a supplement to an application approved under subsection (b) is approved after the date of enactment of this subsection [September 1984] and the supplement contains reports of new clinical investigations (other than bioavailability studies) essential to the approval of the supplement and conducted or sponsored by the person submitting the supplement, the Secretary may not make the approval of an application submitted under this subsection for a change approved in the supplement effective before the expiration of three years from the date of the approval of the supplement under subsection (b).

*Id.* § 355(j)(4)(D)(iv).

## ORDER

Upon consideration of the defendant's Motion for Summary Judgment, the plaintiff's Cross–Motion for Summary Judgment, the oppositions thereto, and the record herein and for the reasons stated in the accompanying memorandum, it is by the Court this 24th day of July, 1988

ORDERED that defendant's Motion be, and hereby is, granted; and it is further

ORDERED that plaintiff's Motion be, and hereby is, denied.