**GLAXO OPERATIONS UK LIMITED, Plaintiff,**

v.

**Donald J. QUIGG, Assistant Secretary of Commerce and Commissioner of Patents and Trademarks, Defendant.**

Civ. A. No. 88–1487–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Feb. 17, 1989.

Paula M. Potoczak, Asst. U.S. Atty., Alexandria, Va. (Fred E. McKelvey, Sol., John C. Martin, Assoc. Sol., Arlington, Va., of counsel), for defendant.

Richard E. Fichter, Bacon & Thomas, Alexandria, Stuart J. Land, Donald O. Beers, John Agar, David E. Korn, Arnold & Porter, Washington, D.C., for plaintiff.

## MEMORANDUM OPINION

ELLIS, District Judge.

### Introduction [1]

In this suit for declaratory and injunctive relief, plaintiff, the holder of a patent for an orally-administered antibiotic drug, challenges the denial of its application for a patent term extension pursuant to the Drug Price Competition and Patent Restoration Act of 1984 (the "Act").[2] Title II of

1. Plaintiff, Glaxo Operations UK Ltd., is a corporation organized under the laws of the United Kingdom. Defendant, Donald J. Quigg, is named in his official capacity as Commissioner of Patents and Trademarks, Department of Commerce. He is referred to throughout as "Commissioner." The Court finds, and the parties concur, that subject matter jurisdiction exists pursuant to 28 U.S.C. §§ 1331 (federal question), 1338(a) (relating to patents) and 1361 (mandamus). The relief requested is authorized by 28 U.S.C. §§ 2201 et seq. (declaratory judgment) and 5 U.S.C. §§ 701 et seq. (Administra-

tive Procedure Act). The parties do not dispute that there exists an actual controversy between them and that venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

2. Title II of the Act, codified at 35 U.S.C. § 156, concerns patent term extensions and is the portion of the Act in issue here. It was amended in 1988 to employ the term "drug product" in place of "human drug product" in 35 U.S.C. § 156(f)(1)(A) and (2). The parties agree that the amendment's sole purpose is to include animal drugs within the existing statutory frame-

the Act, 35 U.S.C. § 156, permits extensions of the patent term for certain patented new drugs required to undergo the Food and Drug Administration's (FDA) rigorous and often time-consuming new drug approval procedures. Such procedures often require years to complete, thereby diminishing the commercial rights provided by the patent. Acutely aware of this, Congress acted to permit extensions of the patent terms to make up some of the time consumed in the FDA approval process.

The parties' dispute in this case presents a straightforward question of statutory interpretation. Specifically, the question presented is whether plaintiff's patented product meets the requirement of Section 156(a)(5)(A) that the use of the product following FDA approval constitute the first commercial marketing or use. Because the essential, dispositive facts are undisputed, summary judgment is appropriate. Rule 56, Fed.R.Civ.P. For the reasons stated, the Court grants plaintiff summary judgment as to Count I and awards declaratory and injunctive relief.

*Facts*

Plaintiff holds Patent No. 4267320 claiming cefuroxime axetil, an orally administered antibiotic drug. It markets this patented compound as Ceftin Tablets, a registered trademark. The patent issued on

work. *See* H.R.Rep. No. 972, 100th Cong., 2d Sess. 8 (1988), reprinted in 1988 U.S.Code Cong. & Admin.News 5659, 5665. The parties also agree that this amendment has no bearing on this case; it does not affect the statutory basis of the Commissioner's denial of the application, which occurred prior to this amendment.

Title I of the Act, codified at 21 U.S.C. § 355 and not directly in issue here, established an abbreviated new drug approval process designed to expedite FDA approval for marketing generic versions of so-called pioneer or innovative drugs whose patents have expired. *See* 21 U.S.C. § 355(j). Title I also provides for exclusive marketing periods for certain categories of drugs in order to protect the research and development investment of the pioneer drug industry. *Id.*

Title III, codified at 15 U.S.C. § 70 et seq. and also not in issue here, requires textile product labels to identify the country of manufacture.

For an analysis of the Act and its policy implications, see Wheaton, *Generic Competition and Pharmaceutical Innovation: The Drug Price*

May 12, 1981. As often happens, however, the New Drug Application (NDA) for Ceftin Tablets was not approved by FDA under Section 507 of the Federal Food, Drug and Cosmetic Act until December 28, 1987. To obtain this NDA approval, plaintiff was required to complete a range of tests and procedures, including toxicity tests on animals and clinical tests on humans. *See generally* 21 CFR §§ 312 & 314. After receiving approval from NDA, plaintiff sought an extension of the patent term. Because more than four (4) years were consumed in proceedings before the FDA, plaintiff sought the maximum two year extension of the patent term permitted by the Act. *See* 35 U.S.C. § 156(c).[3]

The active ingredient of Ceftin Tablets is cefuroxime axetil. Unique properties of this distinct pharmaceutical compound make it therapeutically active and effective when administered orally. Cefuroxime axetil is an ester[4] of cefuroxime, an organic acid. This acid and its salts are claimed by plaintiff's United States Patent No. 3,974,-153. Cefuroxime and its salt, cefuroxime sodium, are both antibiotics that are therapeutically active only when administered intramuscularly or intravenously. Neither is effective if administered orally. The FDA has previously approved NDA's for two sodium salts of cefuroxime. Zinacef was approved in 1983 and Kefurox in 1986

*Competition and Patent Term Restoration Act of 1984,* 35 Cath.U.L.Rev. 433 (1986).

**3.** The determination whether a patent is eligible for a term extension is made by the Commissioner "solely on the basis of the representations contained in the application for extension." 35 U.S.C. § 156(e)(1). The Commissioner then forwards the application to FDA for determination of the "applicable regulatory review period." 35 U.S.C. § 156(d)(2)(A). The "regulatory review period" reflects the time consumed while the patent undergoes clinical tests plus the time taken by FDA to evaluate the results. 35 U.S.C. § 156(c) & (g).

**4.** An "ester" is a chemical compound resulting from the reaction of an alcohol with an acid. The reaction is termed esterification and results in a compound formed by replacing the hydrogen of the acid with an alkyl, aryl, or other appropriate radical. *See Van Nostrand's Scientific Encyclopedia* 979 (5th ed. 1976).

and 1987. No approval has ever issued for the acid cefuroxime.

Plaintiff filed the term extension application in issue here on September 9, 1988. The Commissioner denied the approval, asserting that cefuroxime axetil was not eligible for patent term extension because the 1987 FDA approval of Ceftin Tablets was not the first permitted commercial marketing or use of the product. In support of this rejection of the application, the Commissioner stated that:

> [t]hus, for the purpose of eligibility for patent term extension, an active ingredient in the acid, salt or ester form is treated as the same drug product.

> Applying the explicit terms of the statute to the circumstances of this application for patent term extension, it must be concluded that the active ingredient in CEFTIN is an ester of cefuroxime. A sodium salt of cefuroxime has been approved for commercial marketing or use by the FDA prior to the approval of CEFTIN. Accordingly, the permission for commercial marketing or use of the product (i.e. the active ingredient cefuroxime axetil) after the regulatory review period was not the first permitted commercial marketing or use of the product (cefuroxime as a salt or ester) under the provision of law under which the regulatory review period occurred.

*In re Glaxo Operations UK Limited,* Request for Patent Term Extension Under 35 U.S.C. § 156 For U.S. Patent No. 4,267,320 at 3–4 (Sept. 9, 1988).

More recently, the Commissioner, in his initial brief on this issue, stated that upon further reflection Ceftin Tablet's active ingredient is cefuroxime the acid, not cefuroxime axetil the ester. The Commissioner requested a remand to add this finding to the record and to change accordingly the rationale for his decision. At oral argument, the need for a remand was unclear. Accordingly, the Court ordered further briefing to clarify the nature of the Commissioner's proposed rationale. The Court

has now reviewed the supplemental brief and concludes, on the basis of the record as a whole, that a remand is neither necessary nor warranted. Remand for agency reconsideration may be appropriate if, on a correct reading of the law, questions of fact or policy remain unresolved. Agency reconsideration may also be appropriate where there is "such failure to explain agency action as to frustrate effective judicial review," *Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1972), or where the agency's factual findings cannot be sustained on the record. *See Florida Power & Light v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985); *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 549, 98 S.Ct. 1197, 1214, 55 L.Ed.2d 460 (1978). None of these conditions obtains here. On the contrary, the Commissioner's proposed rationale is adequately explained in his supplemental briefs. Simply put, this is a case in which undisputed material facts and unambiguous statutory language compel rejection of the Commissioner's second rationale, as well as his first. While the Court is not compelled to consider the Commissioner's proposed rationale,[5] it does so in the interests of good judicial husbandry and the expeditious resolution of this dispute. Also in the interests of good judicial husbandry, the Court addresses Count II of plaintiff's complaint even though the Court's ruling with respect to the first count provides plaintiff with all the requested relief. As it happens, the plaintiff's legal position in connection with the second count is inconsistent with its position on the first count, with the result that the Commissioner would prevail in the second count if it became material to this case.

### Analysis

**A. Count I**

A patent is eligible for a term extension under the Act if five conditions are met:

---

**5.** Ordinarily, "courts may not accept appellate counsel's *post hoc* rationalizations for agency action," for "it is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Manufacturer's Ass'n v. State Farm Mutual Automobile Ins., Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983) (citations omitted).

(1) the term of the patent has not expired before an application is submitted under subsection (d) for its extension;

(2) the term of the patent has never been extended;

(3) an application for extension is submitted by the owner of record of the patent or its agent and in accordance with the requirements of subsection (d);

(4) the product has been subject to a regulatory review period before its commercial marketing or use;

(5) (A) . . . the permission for the commercial marketing or use of the product after such regulatory review period is the first permitted commercial marketing or use of the *product* under the provision of law under which such regulatory review period occurred[.] (Emphasis added.)

35 U.S.C. § 156(a).

█ Undisputed in this case is that plaintiff's application for extension of the plaintiff's cefuroxime axetil patent meets the first four conditions. Only the fifth, Section 156(a)(5)(A), is in issue here. Given this, the question sharply presented is whether the "product" referred to in (a)(5)(A) is cefuroxime axetil, on the one hand, or cefuroxime, the parent acid on the other. The answer to this question turns on the statutory definition of "product." Subsection (f) of Section 156 defines "product" as "a drug product," which, in turn, is defined as follows:

(2) The term "drug product" means the active ingredient of a new drug, anti-

biotic drug, or human biological product (as those terms are used in the Federal Food, Drug, and Cosmetic Act and the Public Health Service Act) including any salt or ester of the active ingredient, as a single entity or in combination with another active ingredient.

35 U.S.C. § 156(f)(2). The central question then is whether the active ingredient of Ceftin Tablets is the ester cefuroxime axetil or the parent acid cefuroxime. If the former is true, plaintiff is entitled to an extension of its patent term.[6] If the latter is true, then no extension would be warranted because the FDA has previously approved NDA's for Zinacef and Kefurox, two sodium salts of cefuroxime.

Undisputed record facts leave no doubt as to the answer to this question: It is cefuroxime axetil that is the "active ingredient" in Ceftin Tablets.[7] Cefuroxime itself is not present at all in Ceftin Tablets; it is therefore not an "ingredient." This conclusion is inescapable given the plain and unambiguous language of the statute. An ingredient is a "constituent element of a mixture or compounds." *Webster's Second University Dictionary* (1984). It must be something found in the mixture or compound, not just something that can be derived from it or from which the mixture or compound can be derived. Simply because the ester cefuroxime axetil may be derived from the acid cefuroxime through esterification is no basis for concluding that cefuroxime is some how an "ingredient." One might as well say that a caterpillar is an ingredient of a butterfly. This

---

**6.** This would follow under (a)(5)(A) because FDA has not previously approved cefuroxime axetil or any salt or ester of it. Note that it is doubtful that any salt or ester of the ester cefuroxime axetil exists since cefuroxime acetyl has no free acid group.

**7.** The record evidence that cefuroxime axetil is the active ingredient in Ceftin Tablets includes at least the following:
(a) The Commissioner himself conceded this in his decision denying the patent term extension. He wrote that "it must be conclude that the active ingredient in CEFTIN is an ester of cefuroxime." *In re Glaxo Operations UK Limited,* Request for Patent Term Extension Under 35 U.S.C. 156 For U.S. Patent No. 4,267,-320 at 4 (Sept. 9, 1988).

(b) The Commissioner has also conceded that cefuroxime, the acid, is not present in Ceftin Tablets.
(c) Ceftin Tablet's labeling, approved by FDA, lists cefuroxime axetil as the active ingredient.
(d) FDA's published Guide to FDA Approved Drugs lists cefuroxime axetil as the active ingredient. *Approved Products with Therapeutic Equivalence Evaluations,* 3–47 (8th ed. 1988).
Also significant is that the FDA's regulation specifying the composition of cefuroxime axetil (Ceftin) tablets states that the ester is included, but makes no mention of the acid. *See* 21 C.F.R. § 442.119(a).

is palpably not so. To be sure, a butterfly comes from, or derives from, a caterpillar in metamorphosis as does the ester from the acid in esterification. But there is no caterpillar that is part of a butterfly, just as the acid itself is not a part of or found in the ester.

The Commissioner seeks to avoid this result by advancing a new rationale. In essence, the Commissioner's new rationale argues that cefuroxime is an active ingredient in Cefrin Tablets because it is, ultimately, the therapeutically effective agent. The explanation is as follows: Cefuroxime axetil, active on oral administration, is absorbed from the gastrointestinal track and then hydrologized in the blood and intestinal track to release cefuroxime into the circulation. And it is cefuroxime that is the effective anti-bacterial agent. Because the therapeutic effect of cefuroxime axetil is ultimately related to the cefuroxime released in the digestive tract, the Commissioner argues that cefuroxime is "the active moiety" of Ceftin Tablets and thereby falls within (a)(5)(A). This rationale is untenable, its flaw manifest. The statute says "ingredient," not "moiety." And, as noted, an "ingredient" must be present in the drug product when administered. This is an insurmountable obstacle for the Commissioner's proposed rationale given that he concedes, as he must, that "Cefuroxime itself is *not* an ingredient of Ceftin Tablets." Commissioner's Supplemental Brief at 17.[8] Even if a "moiety," in pharmaceutical parlance, is something that results from chemical changes occurring af-

ter the drug is administered and need not itself be present in the drug product at the time of administration, this is not the plain meaning of "ingredient."[9] And, neither this Court, nor the Commissioner is at liberty to ignore this plain meaning and the fact that the statute uses "ingredient," not "moiety." Equating "active moiety" with "active ingredient," as the Commissioner urges, results in reading out of the statute the plain meaning of the phrase Congress chose. This is unwarranted for " '[a] fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.' " *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1426 (Fed.Cir. 1988) [quoting *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979) ].

Nor does the legislative history furnish any basis for ignoring the plain and unambiguous meaning of "active ingredient." The Commissioner attached to his supplemental brief several volumes of the Act's legislative history. Yet he forthrightly concedes that this extensive history contains no specific discussion of the definitions of the statutory term "active ingredient," the non-statutory term "active moiety" or any of the specific issues raised here. And, indeed, this is the case. Even so, the Commissioner attempts to fashion an argument based on the legislative history's discussions of "new chemical entities." The attempt fails. At worst, the Commissioner misconstrues this history.[10] At best,

8. Cefuroxime, as an acid, has a molecular structure different from that of cefuroxime axetil or Ceftin Tablets. In shorthand form, cefuroxime may be denoted as R–COOH whereas cefuroxime axetil is

$$R\text{--}COO\text{--}CHOCO\text{--}CH_3.$$
$$|$$
$$CH_3$$

"R" here denotes a radical that is common to the structures of both the acid and the ester. *See* Commissioner's Supplemental Brief, Appendix 1.

9. The FDA, in the antibiotics context, has apparently noted this distinction in the meaning of "ingredient" and "moiety:"

each salt or ester of a therapeutic agent is a unique active drug ingredient. For example,

tetracycline hydrochloride and tetracycline phosphate complex are distinct active drug ingredients containing the same therapeutic moiety.

44 Fed.Reg. 2932, 2938 (Jan. 12, 1979).

10. The Commissioner's reliance on certain discussions in the history concerning "new chemical entities" is misplaced. First, Congress was surely aware of the term "new chemical entity" as that term had an established meaning in FDA parlance. Yet, significantly, Congress did not use "new chemical entity" in the Act, nor did it equate that term with the term "product," which is used in the Act. Congress equated the term "product" with "active ingredient." Moreover, defendant's position relies on a false premise, namely that congressmen in the few times they used the term "new chemical entity" meant the

the history is ambiguous, in which case, as noted in *United States v. Canadian Vinyl Indus., Inc.,* 555 F.2d 806, 811 (C.C.P.A. 1977), this Court should not "alter the clear meaning of the statute because of ambiguous legislative history." [11] Indeed, the operative rule here is as follows:

> If the statutory language is unambiguous, in the absence of "a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive."

*United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) [quoting *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)]; *see also, Burlington N. Ry. Co. v. Oklahoma Tax Comm'n,* 481 U.S. 454, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987); *Ethicon, Inc. v. Quigg,* 849 F.2d at 1426; *Darsigny v. Office of Per-*

*sonnel Management,* 787 F.2d 1555, 1557 (Fed.Cir.1986). Because Section 156 is unambiguous and because there is no contrary legislative intent, the language must be given its plain meaning. Cefuroxime, whether or not it is an "active moiety," is not an "ingredient" in Ceftin Tablets because it is not present therein. This sensible conclusion leads to a sensible result entirely consistent with the purpose of Section 156(f), which is to reward a patentee for research and development efforts by extending the life of a patent covering an innovative new drug whose marketing was delayed by FDA regulatory review. That purpose is served by extending the patent for cefuroxime axetil because commercial exploitation of this innovative drug was delayed more than four years by the FDA review process. In short, giving Section 156(f) its plain meaning is fully consistent with the Act's purpose.[12]

FDA technical phrase "new molecular entity," which includes reference to "active moiety" in its definition. Nothing in the legislative history supports this. Therefore, there is no reason to assume, as the Commissioner does, that the occasional use of the term "new chemical entity" meant "new molecular entity" or "active moiety." In sum, this Court declines to disregard the clear language of the Act in favor of unsupported assumptions about what congressmen meant when they used the phrase "new chemical entity."

11. The legislative history is found as follows: *Drug Price Competition and Patent Term Restoration Act of 1984; Hearings on S. 2748; Before the Senate Comm. on Labor and Human Resources,* 98th Cong., 2d Sess. (1984); *Innovation and Patent Law Reform: Hearings on H.R. 3285, H.R. 3286, and H.R. 3605 Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Comm. on the Judiciary,* 98th Cong., 2d Sess. (1984); H.R.Rep. No. 696, 97th Cong., 2d Sess (1982); H.R.Rep. No. 857, Part 1, 98th Cong. 2d Sess. (1984); H.R.Rep. No. 857, Part 2, 98th Cong., 2d Sess. (1984); H.R. 6444, 97th Cong., 2d Sess. (May 20, 1982); H.R. 6444, 97th Cong., 2d Sess. (Aug. 4, 1982), as amended; H.R. 3605, 98th Cong., 1st Sess. (July 19, 1983); S. 2748, 98th Cong., 2d Sess. 1 and 30–47 (June 12, 1984); H.R. 3605, 98th Cong., 2d Sess. 1–2 and 30–47 (June 21, 1984), as amended; H.R. 3605, 98th Cong., 2d Sess. 1–2 and 31–48 (Aug. 1, 1984), as further amended; H.Res. 569, 98th Cong., 2d Sess. (Aug. 8, 1984); 129 Cong.Rec. S8915 (daily ed. June 29, 1984); 129 Cong.Rec. S8950 (daily ed. June 29, 1984); 130 Cong.Rec. H8701 (daily

ed. Aug. 8, 1984); 130 Cong.Rec. S10503 (daily ed. Aug. 10, 1984); 130 Cong.Rec. H9105 (daily ed. Sept. 6, 1984); 130 Cong.Rec. S10981 (daily ed. Sept. 12, 1984).

Exhaustive exegesis of this voluminous legislative history yields nothing conclusive. The precise issue presented here was not discussed. Adopting an interpretation of the statute based on the preferences of some legislators who may have favored limiting the Act to "new chemical entities" hardly gives fair effect to the views of the majority who ultimately voted to use the clear phrase "active ingredient." Even assuming, as the Commissioner argues, that some legislators preferred limiting the Act to the new chemical entities/new molecular entities, those policy preferences cannot displace the statute's plain language. If an ambiguous compromise was Congress' goal it failed to use ambiguous language.

12. Some may complain that giving the Act its plain meaning results in an unattractive asymmetry. The perceived asymmetry arises as follows: Giving "active ingredient" its plain, ordinary meaning results in granting patent term extensions where the new active ingredient is an ester, even though a salt or acid related to the ester were previously approved by FDA. Yet no extension is available where the active ingredient is an acid and a salt or ester of that acid has previously received FDA approval. Even if these results are asymmetrical, the short answer to this is that neither the Commissioner nor this Court sit to rewrite Congressional acts to ensure their symmetry. Congress has the widest latitude in deciding how to achieve its purposes. *Cf. Tennessee Valley Authority v. Hill,* 437 U.S.

Both parties cite *Abbott Laboratories v. Young,* 691 F.Supp. 462 (D.D.C.1988). That case concerns the interpretation of "active ingredient" as the phrase is used in the Act's Title I market exclusivity provisions. *See* 21 U.S.C. § 355(j)(4)(D). The FDA argued there, as the Commissioner does here, that "active ingredient" should be equated with "active moiety." Abbott disagreed, taking the position that an "ingredient" is different from a "moiety" because the former, but not the latter, must actually be present in the drug at the time it is administered. Ultimately, the court did not definitively decide this issue because it concluded, incorrectly it appears, that both definitions led to the same result: the applicability of the two year market exclusivity period. It does appear, however, that the *Abbott* court recognized a distinction between the plain meaning of "active ingredient" and the FDA's use of "active moiety." In any event, because the court apparently misread one of the provisions, it appeared to equate them. Thus, any sympathy it may have expressed for the FDA's equation of the terms is unpersuasive. A more complete treatment of the decision illustrates this.

In *Abbott,* the FDA in 1978 had previously approved Depakene, an anticonvulsant for treatment of seizures. Depakene's active ingredient, everyone acknowledged, is valporic acid. This agent frequently caused undesirable gastrointestinal side effects. Three years later, in 1981, Abbott developed Depakote, a specially coated tablet anticonvulsant. In this form, the tablet does not dissolve in the stomach and thus causes no adverse side effects. To achieve this result, Abbott replaced the valporic acid with divalproex sodium, a derivative salt of the acid. When Depakote reaches a certain point in the digestive tract, the divalproex sodium is converted to valporic acid and the same anticonvulsant therapeutic effect is ultimately achieved. Like cefuroxime, valporic acid is not an ingredient of the drug as it is administered, but comes about after administration as a result of chemical changes and is ultimately the effective therapeutic agent.

On these facts, Abbott sought a 10-year period of market exclusivity pursuant to 21 U.S.C. § 355(j)(4)(D)(i).[13] In essence, this subsection grants 10 years of market exclusivity to a drug that was approved by FDA between January 1, 1982 and September 24, 1984 provided that neither the drug's active ingredient, nor any salt or ester of that active ingredient, had been previously approved by the FDA. As the court noted, acceptance of Abbotts' plain language definition of "active ingredient" would lead to granting the 10 year period of market exclusivity because neither divalproex sodium, nor any salt or ester of it had previously received FDA approval. The court went on, however, to consider whether the case also fit under the two-year market exclusivity provision, 21 U.S. C. § 355(j)(4)(D)(v),[14] as FDA urged. That

153, 194, 98 S.Ct. 2279, 2301, 57 L.Ed.2d 117 (1978). In any event, the asymmetry may be illusory because in general it is not exceptionally difficult to reach the acid form once the salt or ester has been isolated. By contrast, the development of an innovative ester or salt from the acid may be worthier of reward because many different salts or esters may derive from a single acid and it is, not infrequently, more difficult to find an innovative salt or ester from the acid. Thus, there may be a sound basis for allowing the patent term extension in the one case, but not the other.

13. Subsection (i)'s turgid language is as follows:
   If an application (other than an abbreviated new drug application) submitted under subsection (b) for a drug, no active ingredient (including any ester or salt of the active ingredient) of which has been approved in any other application under subsection (b), was

approved during the period beginning January 1, 1982, and ending on the date of the date of enactment of this subsection [September 24, 1984], the Secretary may not make the approval of an application submitted under this subsection which refers to the drug for which the subsection (b) application was submitted effective before the expiration of ten years from the date of the approval of the application under subsection (b).

14. The equally turgid language of this subsection is as follows:
   If an application (or supplement to an application) submitted under subsection (b) for a drug, which includes an active ingredient (including any ester or salt of the active ingredient) that has been approved in another application under subsection (b), was approved the period beginning January 1, 1982, and ending

subsection essentially provides for an exclusive marketing privilege until September 24, 1986 for any drug approved pursuant to the complete new drug application process, provided that the drug's active ingredient, or the salt or ester of that active ingredient, had received prior FDA approval during the period January 1, 1982 to September 24, 1984. Acceptance of Abbotts' position here leads to the conclusion that this subsection (and hence the two year market exclusivity period) is inapplicable because neither the active ingredient, nor any salt or ester of it, had received prior FDA approval. The court in *Abbott* concluded otherwise, apparently because it misread the subsection to mean that the two year market exclusivity period applied where the active ingredient in the applicant drug was a salt or ester of some other approved ingredient not present in the product. Subsection (v) applies where the active ingredient in the applicant drug or a salt or ester of *that* active ingredient received prior FDA approval. It does not apply where the active ingredient in the applicant drug is the salt or ester of some other approved ingredient. In essence, while the *Abbott* court recognized that subsections (i) and (v) are complementary, it then failed to recognize that they are also necessarily mutually exclusive. A product that qualifies under (i) cannot qualify under (v) and vice versa.[15] Given this misreading of the subsection, the court incorrectly concluded that Abbotts' position led to the application of both the two and ten year periods, a result it termed an "irreconcilable statutory conflict." 691 F.Supp. at 472. In fact, no such conflict exists; if there is no prior approval of the active ingredient under review, or its salt or ester, then (assuming

other requirements are met) the ten year period applies. If, by contrast, there is prior approval for the active ingredient, or its salt or ester, then (assuming other requirements are met) the two year period applies.

Though not dispositive here, *Abbott* is useful for the light it casts on the distinction between the plain meaning of "active ingredient" and the pharmaceutical meaning "active moiety." Thus, the *Abbott* opinion notes specifically that in the context of the Abbreviated New Drug Application (ANDA) portions of Title I, the FDA construes "active ingredient" as this Court does here, namely in accordance with its plain meaning.

> On several occasions, the FDA has determined a drug to be ineligible for the ANDA process because this requirement was not satisfied. In making this determination, the Agency has stated that "[t]he term active ingredient in the Act refers to the active ingredient *found in the final dosage form prior to the administration of [the] product to the patient*, rather than to any resultant form the drug may take following administration.

691 F.Supp. at 469 (quoting letter from Dr. Peter H. Rheinstein, Center for Drugs and Biologics, to I.R. Berry, Pharmacaps, Inc.) (Feb. 13, 1986) (emphasis in the *Abbott* opinion). The court in *Abbott* went on to note that FDA acknowledged the propriety of this construction in the ANDA context, but argued that a different construction of "ingredient," that of equating it with "moiety," was necessary in the context of the exclusive marketing provisions. This, the *Abbott* court declined to permit, saying

---

on the date of the enactment of this subsection [September 24, 1984], the Secretary may not make the approval of an application submitted under this subsection which refers to the drug for which the subsection (b) application was submitted ... before the expiration of two years from the date of enactment of this subsection [September 24, 1984].

**15.** The portion of the decision that reflects this misreading is as follows:

Restated, the subsection allowed exclusive marketing until September 24, 1986 to a drug

that was approved pursuant to the complete new drug application process *and that contains an active ingredient or the salt or ester of an active ingredient that had previously been approved by the FDA.* Assuming, as Abbott would like, that divalproex sodium is the active ingredient in Depakote, subsection (v) requires that the drug receive only two years of exclusive marketing rights because divalproex sodium is a salt of valproic acid.

*Abbott Laboratories,* 691 F.Supp. at 472 (emphasis added).

**1232**

[i]n the absence of an express congressional statement or other evidence of congressional purpose, the Agency's diametrically conflicting interpretations of "active ingredient" cannot be accepted.... Such statutory construction simply is unreasonable.

691 F.Supp. at 470 (citations omitted); *see also id.* at 473 (FDA's different constructions of "ingredient" had "no support in the language of the statute or the legislative history"). In sum, *Abbott* generally supports this Court's conclusion that there is a significant difference between the plain meaning of the statutory term "active ingredient" and the Commissioner's (and FDA's) use of the term "active moiety" and further that equation of these terms is impermissible absent some express congressional statement to the contrary.

It is important to note that in insisting upon the plain meaning of the statute, the Court here in no way seeks to substitute its judgment on highly technical or factual matters for that of the Commissioner, nor does it limit or preclude the legitimate, defined exercise of policymaking discretion that Congress may delegate to administrative agencies. *See* 5 U.S.C. § 701(a)(2) (judicial review under Administrative Procedure Act inappropriate where agency action committed to agency discretion by law). Similarly, this is not a case where this Court has declined to accord deference to a range of permissible agency choices. *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Baltimore Gas & Elec. Co. v. N.R.D.C., Inc.,* 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983); *United Transportation v. Lewis,* 711 F.2d 233, 252 (D.C.Cir.1983). Rather, this is an instance where an agency has made a policy judgment at odds with the statute's plain meaning and now seeks to implement this judgment. However sound the Commissioner's policy judgment may be, neither he nor this Court may implement it against the statute's plain meaning.

To hold otherwise impermissibly transfers policymaking power from Congress to the administrative agencies and the judiciary. The Commissioner's remedy is with Congress.[16]

In summary, it is undisputed that cefuroxime axetil is the active ingredient of Ceftin Tablets, not cefuroxime, which is not present at all in the tablets. Further, it is undisputed that no prior FDA approval exists for cefuroxime axetil, or any ester or acid of it. From this, it follows that (a)(5)(A) is satisfied and that the Commissioner's contrary decision is arbitrary and capricious.

### B. *Count II*

Plaintiff's Count II theory is fundamentally inconsistent with its Count I position. In Count I, plaintiff proceeded on the premise that the definition of "drug product" in Section 156(f) is controlling in Section 156(a)(5)(A). Count II, by contrast, denies that Section 156(f) controls (a)(5)(A). Plaintiff argues that because the last sentence of 156(a) states that the "product" referred to in (a)(5)(A) is referred to as "approved product," the "product" in (a)(5)(A) is different from that defined in 156(f). An "approved product," plaintiff claims, is self-evidently the product FDA approved. Since FDA had never previously approved the product Ceftin Tablets, (a)(5)(A) is satisfied and a patent term extension warranted. Under plaintiff's Count II theory, it is irrelevant whether FDA had previously approved an active ingredient or a salt or ester of it.

■ Count II's theory is unsound. Section 156(f) states that its definition of "product" applies "for purposes of this [156] section." No separate definition of "approved product" is provided. Nor is one needed; it plainly means a "product," as defined in Section 156(f), that has received FDA approval, as set forth in Sec-

---

**16.** There, his policy arguments may win changes in language that would effectuate his policy views. For example, patent term extensions could be barred for drugs whose "active ingredient or derivative ester, salt or acid" have received prior approval.

tion 156(a)(4) and (5).[17]  In short, the plain meaning of the statutory language is as dispositive of Count II as it is of Count I. That language unambiguously requires that the paragraph (f) definition be applied through the Section.

Plaintiff argues that applying the Section 156(f) definition of "product" to (a)(5)(A) renders Section 156(c)(4), which allows only one patent to be extended per FDA approval, "difficult to explain."[18]  According to plaintiff, Section 156's definition applied to (c)(4) suggests (i) that there may be more than one regulatory review period for a single product or active ingredient and (ii) that different patents can be extended for those different periods.  Plaintiff's suggested inferences are only half right.  As to the first, there may well be (and appropriately so) more than one regulatory review period for a single "product" or "active ingredient."  But this does not follow from applying 156(f) to (c)(4); rather it is simply the result of including alternative forms of the active ingredient (*i.e.*, the salt or ester) within the "product definition." The second inference is wrong;  patent term extensions are limited to one per product;  (a)(5)(A) achieves this result in most instances and subsection (c)(4) operates to preclude multiple patent terms extensions in those few instances that escape the reach of (a)(5)(A).  For example, a product patent, a method of use patent and a method of manufacturing patent may all relate to the same drug subjected to a single regulatory review period.  Applications for extensions of the three patents would be based on the same FDA approval.  Given this, (a)(5)(A) may not preclude extension of all three patents, but (c)(4) would limit the extension to one of the three.  In sum, plaintiff's arguments do not overcome the statute's plain language, which compels the conclusion that the definition of "product" in (f) applies to the entire section.[19]  Accordingly, Count II fails.

### Conclusion

For the reasons set forth here, the Court grants summary judgment for plaintiff on Count I.  The Commissioner's decision denying patent term extension is based on an incorrect construction of the Act.[20]  Were it necessary to reach Count II, the Court would dismiss it, for here it is plaintiff who misconstrues the statute.

An appropriate order will enter.

17. *Fisons plc v. Quigg*, 8 USPQ 2d 1491 (D.D.C. 1988) (appeal pending), which also rejected the theory advanced in plaintiff's Count II, used an entertaining, if not necessarily apt, metaphor to illustrate this point: Congress in Section 156(a) referred to an animal with four legs and a hump, and then stated further in the last sentence that the animal would thereafter be referred to as a "camel."  Then, in Section 156(f) Congress stated, further, that only dromedaries, not Bactrian, camels warrant statutory protection.

18.  Subparagraph (c)(4) reads as follows:
(c) The term of a patent eligible for extension under subsection (a) shall be extended by the time equal to the regulatory review period for the approved product which period occurs after the date the patent is issued, except that—

. . . .
(4) in no event shall more than one patent be extended for the same regulatory review period for any product.
35 U.S.C. § 156(c)(4).

19.  Not surprisingly, the court in *Fison plc v. Quigg*, 8 U.S.P.Q. 2d 1491 (D.D.C.1988) (appeal pending), reached the same result and in doing so found the legislative history to be consistent with the statute's plain meaning.

20.  The appropriate standard for review is whether the Commissioner's interpretation of 35 U.S.C. § 156(a)(5)(A) is contrary to law.  5 U.S.C. § 706(2)(A); *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *Federal Election Commission v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 36–39, 102 S.Ct. 38, 44–46, 70 L.Ed.2d 23 (1981).