The AD HOC COMMITTEE OF AZ–NM–TX–FL PRODUCERS OF GRAY PORTLAND CEMENT, Plaintiff–Appellant,

v.

The UNITED STATES, Defendant–Appellee,

Cemex S.A., Defendant–Appellee,

and

Apasco, S.A. de C.V., Defendant–Appellee.

No. 93–1239.

United States Court of Appeals,
Federal Circuit.

Jan. 5, 1994.

Rehearing Denied March 1, 1994.

Martin M. McNerney, Kilpatrick & Cody, New York City, argued for plaintiff-appellant. With him on the brief were Joseph W. Dorn and Michael P. Mabile.

A. David Lafer, Sr. Trial Counsel, Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued for defendant-appellee, U.S. With him on the brief were Stuart E. Schiffer, Acting Asst. Atty. Gen. and David M. Cohen, Director. Also on the brief were Stephen J. Powell, Chief Counsel

for Import Admin., Berniece A. Browne, Sr. Counsel for Antidumping Litigation and Terrence J. McCartin, Attorney–Advisor, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce.

Thomas R. Graham, Skadden, Arps, Slate, Meagher & Flom, Washington, DC, argued for defendant-appellee, Cemex, S.A. With him on the brief was John J. Burke.

John H. Blatchford, O'Connor & Hannan, Washington, DC, was on the brief for defendant-appellee, Apasco, S.A. de C.V.

Irwin P. Altschuler, David R. Amerine and Ronald M. Wisla, Manatt, Phelps & Phillips, Washington, DC, represented defendant-appellee, Cemex, S.A.

Before MAYER and LOURIE, Circuit Judges, and LAY, Senior Circuit Judge.[*]

LAY, Senior Circuit Judge.

This is an appeal from a decision of the Court of International Trade brought by the Ad Hoc Committee of AZ–NM–TX–FL Producers of Gray Portland Cement.[1] The Ad Hoc Committee filed an antidumping petition that resulted in investigations of imports of cement and cement clinker from Mexico. The Committee alleged that imports of gray portland cement and cement clinker from Mexico were being, or were likely to be, sold in the United States at less than fair value within the meaning of 19 U.S.C. § 1673 (1988). The Committee alleged that as a result of the unfair price, an industry in the United States was materially injured or threatened with material injury by reason of these imports. The International Trade Administration of the United States Department of Commerce (Commerce) compared the United States and home-market sales of three Mexican producers of cement, including defendant-intervenors Cemex, S.A., and Apasco, S.A. de C.V., as well as Cementos Hidalgo, S.C.L., and reached a final determination that Mexican cement and clinker were being, or were likely to be, sold in the United States at less than fair value. Gray Portland Cement and Clinker from Mexico, 55 Fed.Reg. 29,244 (Dep't Comm.1990). The Antidumping Act provides that a foreign producer engages in dumping to the extent that the United States price (USP),[2] as calculated pursuant to 19 U.S.C. § 1677a, is less than the foreign market value (FMV)[3] of the

---

[*] Honorable Donald P. Lay, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

[1] The Ad Hoc Committee is an association of United States producers of gray portland cement and clinker with production facilities in Arizona, New Mexico, Texas, and Florida.

[2] USP is initially measured as either the "purchase price" or "exporter's sales price" (ESP) of the merchandise, whichever is appropriate. 19 U.S.C. § 1677a(a) (1988). "Purchase price" is the price at which a buyer in the United States agrees to purchase the merchandise from a reseller or from the foreign manufacturer. 19 U.S.C. § 1677a(b) (1988). Zenith Elecs. Corp. v. United States, 988 F.2d 1573, 1577 (Fed.Cir. 1993). This measure of USP is used where the U.S. importer is an unrelated, independent party. Smith–Corona Group v. United States, 713 F.2d 1568, 1572 (Fed.Cir.1983), cert. denied, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). "Exporter's sales price" is the price at which the foreign manufacturer or its agent sells or agrees to sell the merchandise in the United States. 19 U.S.C. § 1677a(c) (1988). Zenith, 988 F.2d at 1577. It is used where the importer is related to the foreign manufacturer, such that an arm's length transaction does not occur until the goods are resold to a retailer or to the public. Smith–Corona, 713 F.2d at 1572. In this case, Com-

merce used the purchase price approach. Once the initial USP figure is established, the statute then specifically requires Commerce to deduct, in the section relevant to this appeal, any amount "attributable to any additional costs, charges, and expenses, and United States import duties, incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States." 19 U.S.C. § 1677a(d)(2)(A) (1988).

[3] Commerce measures FMV as the foreign manufacturer's sale price in the "ordinary course of trade" in its own country, for goods identical or similar to the goods exported to the United States. 19 U.S.C. § 1677b(a)(1)(A) (1988). Where reliable information regarding a foreign manufacturer's home country sales is lacking, Commerce may base FMV on the price of merchandise offered for export sale to countries other than the United States, 19 U.S.C. § 1677b(a)(1)(B) (1988), or on a "constructed value," 19 U.S.C. § 1677b(a)(2) (1988). Zenith, 988 F.2d at 1577. In this case, Commerce based FMV on the foreign manufacturers' home-market sales. Like USP, FMV is to be adjusted to account for various factors. See 19 U.S.C. § 1677b(a)(1), (4) (1988). Unlike the USP provision, however, the FMV provision does not list shipping costs among the amounts to be deducted.

same or similar merchandise, calculated pursuant to 19 U.S.C. § 1677b.[4] Following its determination that dumping had occurred, and a separate finding by the International Trade Commission that a United States industry was being materially injured by imports of gray portland cement and cement clinker from Mexico,[5] Commerce published an antidumping duty order reflecting its calculations of the manufacturers' margins of dumping. *Gray Portland Cement and Clinker from Mexico*, 55 Fed.Reg. 35,443 (Dep't Comm.1990).

The Ad Hoc Committee challenged Commerce's calculations of the dumping margins in the Court of International Trade. *Ad Hoc Committee of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States*, 787 F.Supp. 208 (Ct.Int'l Trade 1992). The court[6] upheld Commerce's deduction from foreign market value of the costs of transporting cement from the manufacturing plants to storage facilities in Mexico prior to its sale to home-market (Mexican) customers. *Id.* We reverse and remand.

## I.

■ The sole issue on appeal is whether the foreign market value provision of the antidumping statute, 19 U.S.C. § 1677b, authorizes a deduction from foreign market value of pre-sale transportation costs within the exporting country for goods sold within that country. The parties agree that although the Act requires Commerce to deduct transportation costs from USP, there is no specific statutory authorization for Commerce to deduct home-market transportation expenses from its calculations of FMV. In the past, Commerce determined whether to deduct home-market transportation costs by looking to the "circumstances of sale" provision of 19 U.S.C. § 1677b(a)(4) (1988).[7] This provision and its accompanying regulations, *see* 19 C.F.R. § 353.56(a)(1) (1993), require a direct relationship between an expense and the sale at issue. Commerce's longstanding general practice, therefore, was to deduct from foreign market value only those transportation costs incurred *after* the date of sale, when the direct relationship was established. *See, e.g., Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from the Federal Republic of Germany*, 54 Fed.Reg. 18,992, 19,049 (Comment 33) (Dep't Comm.1989) (final determination); *Television Receivers, Monochrome and Color, from Japan*, 53 Fed.Reg. 4050, 4052 (Comment 18) (Dep't Comm.1988) (final results); *Color Television Receivers from Korea*, 53 Fed.Reg. 24,975, 24,988 (Comment 72) (Dep't Comm.1988) (final results); *Kraft Condenser Paper from Finland*, 47 Fed.Reg. 3813 (Dep't Comm.1982) (final results). Pre-sale transportation expenses were treated as "indirect expenses," deductible from FMV only when ESP was used as the basis for the United States price. *See* 19 C.F.R. § 353.-41(e)(2) (1993). In the case at bar, however, Commerce altered this practice and deducted pre-sale inland freight expenses while conducting a purchase price, rather than the exporter's sale price, comparison. In the present case, Commerce does not rely on the circumstances of sale provision, but on its inherent power as the administering authori-

---

**4.** 19 U.S.C. § 1673 (1988) requires Commerce to assess antidumping duties on imported merchandise "in an amount equal to the amount by which the foreign market value exceeds the United States price for the merchandise." Thus, the higher the FMV and the lower the USP, the greater the margin of dumping and the greater the antidumping duty that will be imposed. *See Zenith*, 988 F.2d at 1576.

**5.** *Gray Portland Cement and Cement Clinker from Mexico*, USITC Pub. 2305, Inv. No. 731–TA–451 (Aug. 1990) (final determination), *aff'd sub nom. Cemex, S.A. v. United States*, 790 F.Supp. 290 (Ct.Int'l Trade 1992), *aff'd*, 989 F.2d 1202 (Fed.Cir.1993) (table).

**6.** The Honorable Jane A. Restani, United States Court of International Trade.

**7.** This provision states:
In determining foreign market value, if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value (or that the fact that the United States price is the same as the foreign market value) is wholly or partly due to—
    . . . .
    (B) other differences in circumstances of sale; . . .
    . . . .
then due allowance shall be made therefor. 19 U.S.C. § 1677b(a)(4) (1988).

ty to fill "gaps" in the statutory framework in reasonable ways consistent with the objectives of the antidumping law.[8]

Commerce argues, and the Court of International Trade agreed, that it has the discretion to deduct home-market transportation costs from foreign market value because the statute is silent and doing so furthers its primary goal when calculating FMVs and USPs of comparing "apples with apples," i.e., comparing prices of merchandise in the United States with those in the foreign market at a similar point in the chain of commerce. *Ad Hoc Comm.*, 787 F.Supp. at 212–13 (citing *Smith–Corona*, 713 F.2d at 1578). The deduction from FMV, when combined with the statutorily mandated deduction from USP, means that on both sides, ex-factory prices will be the basis for comparison. *Id.* Without the deduction from FMV, the comparison is apples to oranges: ex-factory price in the United States but the *ex-warehouse* price in the foreign market.

The Ad Hoc Committee disputes the initial premise that the statute is silent. In its view, the fact that the deduction is included in the provisions for USP but not for FMV means that Congress did not intend for home-market transportation costs to be deducted.

## II.

■ It is well established that where Congress has included specific language in one section of a statute but has omitted it from another, related section of the same Act, it is generally presumed that Congress intended the omission. *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) (citing *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir.1972)); *see also United States v. Azeem*, 946 F.2d 13, 17 (2d Cir.1991); *United States v. Espinoza–Leon*, 873 F.2d 743, 746 (4th Cir.), *cert. denied*, 492 U.S. 924, 109 S.Ct. 3257, 106 L.Ed.2d 602 (1989); *Arizona Elec. Power Cooperative, Inc. v. United States*, 816 F.2d 1366, 1375 (9th Cir.1987). Absent strong evidence to

the contrary, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, —— U.S. ——, ——, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992).

The applicability of this principle was made clear in *Zenith Electronics Corp. v. United States*, 988 F.2d 1573 (Fed.Cir.1993), where we held that Commerce erred when it adjusted both the USP and the FMV to account for Japanese commodity taxes that were collected on merchandise sold in Japan, but not collected on merchandise exported to the United States. We noted that 19 U.S.C. § 1677a(d)(1)(C) (1988) explicitly requires Commerce to increase USP by the amount of taxes that the exporting country would have assessed on the merchandise if it had been sold in the home market. *Zenith*, 988 F.2d at 1580. Commerce applied the circumstances of sale provision to adjust FMV in an effort to achieve tax neutrality in its comparisons, reasoning that adjusting USP to account for the forgiven commodity tax would cause an increase in the dumping margin not directly related to less-than-fair-value sales. *Id.* at 1578. We rejected this approach, concluding that "[t]he Act is not silent about the disparity created between FMV and USP when a foreign government forgives commodity taxes on exports. Section 1677a(d)(1)(C) expressly directs Commerce to adjust USP. In the face of an unambiguous statutory directive, Commerce may only effect tax adjustments under that section." *Id.* at 1582.

■ In the circumstances of this case, we believe that had Congress intended to deduct home-market transportation costs from FMV, it would have made that intent clear. FMV and USP are intimately related concepts, given full meaning only by their relationship to one another. The Antidumping Act revolves around the difference between the two. *See* 19 C.F.R. § 353.2(f)(1) (1993) (defining dumping margin with reference to USP and FMV). In slightly different forms,

---

8. Although intervenors urge that we affirm the Court of International Trade judgment under the "circumstances of sale" provision, we decline the invitation. It is well settled that an agency's

action may not be upheld on grounds other than those relied on by the agency. *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).

the USP provision, 19 U.S.C. § 1677a, and the FMV provision, 19 U.S.C. § 1677b, were passed together as part of the original Antidumping Act, 1921, ch. 14, 42 Stat. 11 (1921). From the Act's beginning, therefore, it is likely Congress has considered one only with reference to the other and has been well aware of any differences between them. That Congress included a deduction for transportation costs from USP but not from FMV leads us to conclude that Congress did not intend pre-sale home-market transportation costs to be deducted from FMV.[9]

## III.

■ In reaching its decision, the Court of International Trade upheld Commerce's interpretation of § 1677b in part because it was "loath to tell ITA it cannot be more fair than it has been in the past when the statute would seem to allow it some room to make the fairer choice." 787 F.Supp. at 213. Thus, the court urged that deducting pre-sale home transportation costs from FMV "engenders a more accurate and meaningful comparison," id., and better serves Commerce's "primary goal" of comparing "apples with apples," id. at 212 (citing Smith–Corona, 713 F.2d at 1578). Under Chevron [10] and its progeny, however, courts do not consider the reasonableness of an agency's interpretation of a statute unless the relevant statute is silent or ambiguous on the question at hand. See Glaxo Operations UK Ltd. v. Quigg, 894 F.2d 392, 398 (Fed.Cir.1990). The general prescriptions of Smith–Corona, which serve to guide Commerce in making reasonable interpretations of the Antidumping Act, do

---

9. The language of the original Antidumping Act, 1921, ch. 14, 42 Stat. 11 (1921), provides strong support for this conclusion. In the original Act, mention of transportation costs is even more conspicuously absent from the FMV provision than it is today. The Act defines "purchase price," what has since 1980 been part of USP, as being the agreed upon price for the merchandise:

> plus, when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, *less the amount, if any, included in such price, attributable to any additional costs, charges, and expenses, and United States import duties, incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States....*

Id. § 203 (emphasis added). Foreign market value is defined in part with the *identical* language, but without any mention of shipping costs. Id. § 205. Thus, FMV is the ordinary home market price:

> plus, when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for shipment to the United States, except that in the case of merchandise purchased or agreed to be purchased by the person by whom or for whose account the merchandise is imported, prior to the time of exportation, the foreign market value shall be ascertained as of the date of such purchase or agreement to purchase.

Id. Even given the vagaries of the legislative drafting process, it is impossible to imagine that Congress unintentionally included the same phrasing in the two passages only up to the point where the deduction for transportation costs from USP was discussed. The omission of the transportation cost deduction from FMV seems fully intended.

Since passage of the original Act, the antidumping laws have been amended and the continuity of the identical phrasing has been eliminated, but the substance of today's USP and FMV statutes remains unchanged. Indeed, despite two significant amendments to the antidumping laws in the past ten years—in the Trade and Tariff Act of 1984, Pub.L. No. 98–573, 98 Stat. 2948 (1984), and in the Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100–418, 102 Stat. 1107 (1988)—Congress has not altered the Act's treatment of home market transportation costs. Congress has not done so, even though it was advised by Commerce in its 1985 "Study of Antidumping Adjustments Methodology and Recommendations for Statutory Change" that Commerce believed it lacked statutory authorization to deduct home-market transportation costs from FMV. That Congress knew of the agency's prior interpretation of the Act and, despite twice amending other Act provisions, did nothing to change the interpretation or the statutory language on which it was based is persuasive evidence that the agency's prior interpretation was the one intended by Congress. See Daewoo Elecs. Co. v. United States, 6 F.3d 1511, 1522 (Fed.Cir.1993); Chaparral Steel Co. v. United States, 901 F.2d 1097, 1105–06 (Fed.Cir.1990) (quoting NLRB v. Bell Aerospace, 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974)). In such circumstances, we cannot attribute the difference between the statute's treatment of transportation costs under the USP and FMV provisions to Congressional inadvertence or inattention.

10. *Chevron USA v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

not apply where the Act itself clearly expresses the intent of Congress. *Zenith,* 988 F.2d at 1582. Because we believe the antidumping statute is not silent on the question of pre-sale home-market transportation cost deductions from FMV, therefore, the reasonableness or fairness of Commerce's interpretation of the Antidumping Act is irrelevant.

Even if the statute's "primary goal" may seem to be ill-served by not allowing the deduction from FMV, that conclusion does not justify reading into the statute agency discretion that clearly is not there. As the Supreme Court stated in *Rodriguez v. United States,* 480 U.S. 522, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987) (per curiam):

> [N]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law.

*Id.* at 525–26, 107 S.Ct. at 1393. Congress acts through bargaining and compromise; legislation frequently includes provisions that are not entirely consistent with the general statutory purpose. In *Glaxo Operations UK Limited v. Quigg,* 894 F.2d 392 (Fed.Cir. 1990), we rejected a claim that the Commissioner of Patents and Trademarks' interpretation of 35 U.S.C. § 156 was more consistent with the general purpose of the Act of which it was a part than the plain statutory language. We concluded:

> We simply cannot say that the plain meaning of section 156 would provide unwanted results because Congress may very well have contemplated all the ramifications of its chosen definition in light of the political realities as seen played out in the legislative process, and we must assume it did.

*Glaxo,* 894 F.2d at 397. We make a similar assumption here. Congress may have wanted the differential for any of a number or reasons, the most evident of which being to increase the likelihood and size of dumping margins found by Commerce. Whatever the reason, it is not this court's role to substitute its view of the statute's purpose for the plain language, or conspicuous lack thereof, in the statute.

Finally, we note that the results of giving effect to the language of the statute by denying the deduction of home-market transportation costs from FMV are not so "absurd" as to justify departure under such cases as *Ambassador Division of Florsheim Shoe v. United States,* 748 F.2d 1560 (Fed.Cir.1984) and *Church of the Holy Trinity v. United States,* 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892). In *Ambassador,* we held that applying the plain statutory language of two tariff provisions, passed together in *pari materia,* would result in one provision frustrating or partially repealing the other. *Id.* at 1565. No such conflict occurs here. Deduction of transportation costs from USP but not FMV creates a *different* comparison than would obtain if the costs were deducted from FMV as well, but neither provision frustrates the operation of the other. As indicated by the fact that Commerce applied the deduction to USP alone for more than a decade without disastrous consequences, the plain language does not lead to absurd results.

## IV.

For the foregoing reasons, the judgment of the Court of International Trade with respect to Commerce's deduction of pre-sale home-market transportation costs from FMV is reversed. The case is remanded with direction that Commerce recalculate the dumping margins involved in this case without such deductions.

Costs awarded to plaintiff-appellant.

REVERSED AND REMANDED.