**Slip Op. 02-24**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  GREGORY W. CARMAN, CHIEF JUDGE**

| | |
|---|---|
| **VIRAJ GROUP, LTD.** | |
| **Plaintiff,** | |
| **v.** | **Court No. 00-06-00291** |
| **UNITED STATES OF AMERICA,** | |
| **Defendant,** | |
| **and** | |
| **CARPENTER TECHNOLOGY, CORP., et al.,** | |
| **Defendant-Intervenors.** | |

[Plaintiff's request that the Department of Commerce's Final Results of Redetermination Pursuant to Court Remand be remanded to the Department of Commerce for reconsideration is granted.  Defendant's request to sustain the Final Results of Redetermination is denied.]

*Ablondi, Foster, Sobin & Davidow* (*Peter Koenig*), Washington, D.C., for Plaintiff.

*Robert D. McCallum, Jr.*, Assistant Attorney General; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; *Lucius B. Lau*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; *David W. Richardson*, Attorney, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, of Counsel, for Defendant.

*Collier Shannon Scott, PLLC* (*Robin H. Gilbert, Laurence J. Lasoff*), Washington, D.C., for Defendant-Intervenors.

Dated: February 26, 2002

## OPINION

**CARMAN**, **Chief Judge:**  Exercising jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994), this Court reviews the Department of Commerce's (Commerce) Final Results of Redetermination Pursuant to Court Remand, *Viraj Group, Ltd. v. United States of America and Carpenter Technology, Corp., et al.*, Slip Op. 01-104 (CIT August 15, 2001) (*Remand Determination*) to determine whether Commerce's approach to the Indian rupee's devaluation during the administrative review period, December 1, 1997 through November 30, 1998, is supported by substantial evidence on the record and otherwise in accordance with law.

## BACKGROUND

In Plaintiff Viraj Group, Ltd.'s (Plaintiff or Viraj) initial challenge before this Court, Plaintiff raised the issue of whether the exchange rate used by Commerce to convert Indian rupees into United States dollars had created an inaccurate dumping margin in *Stainless Steel Wire Rod From India; Final Results of Antidumping Duty Administrative Review*, 65 Fed. Reg. 31,302 (May 17, 2000) (*Final Results*).  Specifically, Plaintiff argued that use of the November 3, 1997 exchange rate distorted dumping margin calculations because the rupee's subsequent devaluation required Viraj to pay more rupees for imported raw materials.  Viraj ultimately recovered its higher cost of production because the devaluation caused it to receive more rupees for the U.S. dollar price of its subject merchandise.  Commerce's use of the earlier exchange rate, however, failed to reflect this offset and caused an understatement of the rupees actually received, resulting in a dumping margin.

This Court remanded this issue to Commerce but sustained the remainder of the *Final*

*Results* in *Viraj Group, Ltd. v. United States of America and Carpenter Technology, Corp., et al.*,

162 F. Supp. 2d 656 (Ct. Int'l Trade 2001) (*Viraj I*).  Specifically, this Court directed Commerce

to: (1) articulate the reasoning behind its approach to the devaluation of the Indian rupee during

the period of review; and (2) properly address and explain whether Commerce's currency

conversion methodology resulted in an accurate dumping margin and, should it be necessary,

recalculate such margin as may be required.

On October 1, 2001, Commerce filed its *Remand Determination* with this Court,

explaining why it had decided alternative means for accounting for the Indian rupee's

depreciation were unnecessary.  As background, Commerce discussed two types of exchange rate

fluctuations–one which it ignores, and the other which it adopts.  *Remand Determination* at 2-3.

Under the first, a spot exchange rate that deviates from the benchmark rate by more than 2.25

percent on a given day is ignored as unrepresentative of the underlying currency value because

the "fluctuation" is "outside the normal range." *Id*. at 2.  Under the second,

> where the currency is depreciating over time, and where the rate of change in the
> exchange rate and the overall change are such that the exchange rate movement
> clearly is more than just a fluctuation that can be ignored, *i.e.*, it represents an
> event signaling a fundamental change in the underlying value of the currency, the
> spot rate on a given day (in the period of currency depreciation) is the best
> measure of the new foreign currency value and is therefore the appropriate
> exchange rate of [sic] currency conversion purposes for any sale occurring on that
> day.  Thus, "fluctuation" in this context means "a change within the normal
> range."

*Id*. at 2-3.

Next, Commerce distinguished the instant case from two scenarios in which currency

conversion concerns caused market participants to make pricing decisions based upon anticipated

future currency values.  In the first scenario, hyperinflation in Brazil increased prices and costs

measured in home currency units, requiring the respondent's pricing decisions to reflect an expected future exchange rate. *See Budd Co., Wheel & Brake Div. v. United States*, 746 F. Supp. 1093 (Ct. Int'l Trade 1990). Commerce reasoned in the *Remand Determination* that its calculations in such a situation should reflect the linkage between hyperinflation, pricing decisions, and anticipated exchange rates. In the instant case, however, Commerce asserted Indian market conditions during the period of review did not make it reasonable to think–and Viraj did not claim–that Viraj had set export price on the basis of a forward exchange rate. *Remand Determination* at 3.

In the second scenario, comprised of two cases, the Korean won fell 40 percent over two months and the Thai baht dropped 18 percent in one day. Commerce stated that these currencies experienced such rapid and large drops in value of apparent medium- to long-term duration that market participants based their changed pricing decisions upon the most current exchange rate data available–the daily current spot exchange rate. *See Notice of Preliminary Determination of Sales at Less Than Fair Value:  Stainless Steel Sheet and Strip in Coils From the Republic of Korea*, 64 Fed. Reg. 137 (Jan. 4, 1999) (*Stainless Steel from Korea*) and *Certain Welded Carbon Steel Pipes and Tubes from Thailand: Final Results of Antidumping Duty Administrative Review*, 64 Fed. Reg. 56,759 (Oct. 21, 1999) (*Pipes and Tubes from Thailand*). In contrast, Commerce stated that in this case the rupee's gradual change made it less likely that market participants would change their pricing, thereby giving Commerce no clear basis to view the currency movement as a fluctuation that could not be ignored. *Remand Determination* at 3-4. Further, Viraj, as an individual market participant, provided no basis for Commerce to invoke its forward exchange rate provision. *Id*. at 4-5.

Commerce concluded:

> In the instant case, what the Department found were typical movements that one would expect of a flexible exchange rate subject to market vagaries. There were no extraordinary aspects to the observed movement in the rupee between November 3, 1997 and November 30, 1998, and no evidence on the record to suggest that the movement was an event or signal recognized at the time by all market participants as warranting a change in their pricing behavior. For this reason, the record supports the Department's decision to treat the depreciation of the rupee as a fluctuation that could be ignored in a manner consistent with the overriding statutory goal of calculating accurate dumping margins. . . . Viraj's [sic] makes an opportunistic claim for the Department to account for rupee depreciation that all agree would lower the calculated dumping margin. But Viraj's claim is hardly distinguishable from a claim based on any of a multitude of changes in other variables that can occur after sale, but which should not be reflected in the dumping margin because they have no connection to respondent's pricing decisions or the terms and conditions of sale.

*Remand Determination* at 5.

Following Commerce's filing of its *Remand Determination*, Plaintiff filed a Memorandum in Opposition to the Final Results of Redetermination of the U.S. Department of Commerce (Plaintiff's Memo). Defendant then filed a Memorandum in Opposition to Plaintiff's Memorandum (Defendant's Memo).

### STANDARD OF REVIEW

This Court will sustain Commerce's *Remand Determination* unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). In assessing whether Commerce's *Remand Determination* is in accordance with law, this Court accords substantial weight to Commerce's interpretation of the statute it administers. *See Floral Trade Council of Davis, CA v. United States*, 888 F.2d 1366, 1368 (Fed. Cir. 1989). In addition, where Congress has implicitly delegated to an agency on a particular question, "a court may not substitute its own construction of a statutory provision for a

reasonable interpretation made by the administrator of an agency." *Chevron U.S.A. Inc. v.*

*Natural Res. Def. Council, Inc.,* 467 U.S. 837, 844 (1984); *see Pesquera Mares Australes LTDA*

*v. United States*, 266 F.3d 1372, 1379-82 (Fed. Cir. 2001) (applying *Chevron* deference to a

statutory interpretation articulated by Commerce in a dumping determination).   If, however,

Commerce's position is unreasonable, "deference does the agency no good." *Thai Pineapple*

*Canning Ind. Corp. v. United States*, 273 F.3d 1077, 1083 (Fed. Cir. 2001) (*Thai Pineapple*).

PARTIES' CONTENTIONS

*Plaintiff's Contentions*

Plaintiff first contends the *Remand Determination* "constitute[s] a mechanical application

of exchange rates that defeats the overriding statutory goal of fair comparisons and accurate

margins" because Commerce's analysis does not address the effect that an exchange rate change

after the purchase order date has upon Viraj's actual costs and money received.  (Plaintiff's

Memo at 2.)  Here, Plaintiff argues, the exchange rate change resulted in Viraj actually receiving

more from its customer than the actual cost to Viraj; therefore, no dumping occurred.  *Id*.

Second, Plaintiff contends Commerce's claims as to Viraj's expectations are not

supported by substantial evidence.  Plaintiff states that because it knew the rupees received

would move in tandem with its costs, it knew that it would ultimately receive more rupees from

customer payments in U.S. dollars to make up for the higher rupees required to pay for imported

raw materials in U.S. dollars.  *Id*.  Plaintiff argues that Commerce defeated these expectations by

using the exchange rate at purchase order date to determine rupees received by Viraj, but the

post-devaluation exchange rate to determine costs.  *Id*. at 2-3.

Third, Plaintiff contends it is unclear how its expectations would be relevant, as dumping

calculations are based upon actual events rather than speculation. *Id*. at 3.

Finally, Plaintiff contends Commerce has not adequately explained why it departed from past practice by calculating the dumping margin without using the rupees actually received. *Id.* at 3.

## *Defendant's Contentions*

Defendant first contends Commerce's determination that it could ignore the fluctuation of the rupee in a manner consistent with the statutory goal of accurate dumping margin calculations is supported by substantial evidence on the record and otherwise in accordance with law. Defendant argues the *Remand Determination* demonstrates that the rupee's gradual depreciation gave Commerce a legitimate reason to have considered the devaluation a fluctuation to be ignored. (Defendant's Memo at 8-9.)

Defendant counters Viraj's argument that Commerce should have calculated the dumping margin using the rupees actually received, claiming that to do so would have contradicted the statutory requirement that Commerce use the exchange rate in effect on the date of sale of the subject merchandise; the only statutory exception, inapplicable here, allows for use of an exchange rate specified in a forward sale agreement. *Id*. at 10. Defendant asserts the statute provides that exchange rate fluctuations shall be ignored and Commerce has adequately explained why it appropriately ignored the rupee's fluctuations in this case. *Id*.

Defendant contends the Court should sustain Commerce's *Remand Determination* even if it did not result in the most accurate dumping margin possible. Defendant argues that the Federal Circuit's position in *Ad Hoc Committee of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States,* 13 F.3d 398 (Fed. Cir. 1994), *cert. denied*, 513 U.S. 813 (1994) conflicts with this

Court's position that the Court must assess whether Commerce's actions further the antidumping

statute's underlying goal of accuracy.  Defendant cites *Ad Hoc* for the proposition that, "where

the Act itself clearly expresses the intent of Congress," the reasonableness of Commerce's

interpretation of the Act is irrelevant.  (Defendant's Memo at 12, *citing Ad Hoc*, 13 F.3d at 402-

403.)  Defendant acknowledges the Federal Circuit has stated in several decisions that Commerce

must determine margins as accurately as possible, and the Statement of Administrative Action

expresses the intent that dumping margins be undistorted by currency conversion practices.

However, Defendant asserts these statements "are hortatory in nature such that specific statutory

provisions that evince the intent of Congress must be followed even if the result appears to be an

unfair or inaccurate dumping margin."  (Defendant's Memo at 13.)  Because Commerce has

followed the "clear directive" of the currency conversion statute, Defendant asserts the *Remand

Determination* should be sustained.  *Id.*

## ANALYSIS

The issue before this Court is whether Commerce's application of its standard currency

conversion methodology resulted in an accurate dumping margin.  The Federal Circuit and this

Court have repeatedly acknowledged that fairness and accuracy are underlying statutory goals of

dumping margin determinations.[1]  In addition, the Statement of Administrative Action (SAA)

---

[1]*See, e.g., Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1313 (Fed Cir. 2001) ("The overarching purpose of the antidumping statute is to permit a fair, apples to apples comparison between foreign market value and United States price . . . .") (internal quotations omitted); *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995) (stating the antidumping laws "are remedial not punitive"); *Koyo Seiko Co., Ltd. v. United States*, 36 F.3d 1565, 1573 (Fed. Cir. 1994) (noting one of the purposes of the antidumping laws "is to calculate antidumping duties on a fair and equitable basis"); *Rhone Poulenc, Inc. v. United States*, 899

states that "[t]o a large extent, the Agreement tracks existing practice, the goal of which is to

ensure that the process of currency conversion *does not distort* dumping margins."[2]  Uruguay

Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, at 841

(1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4177 (SAA) (emphasis added).

> The provision at issue in 19 U.S.C. § 1677b-1 states:

> (a) In general

>> In an antidumping proceeding under this subtitle, the administering
>> authority shall convert foreign currencies into United States dollars using the
>> exchange rate in effect on the date of sale of the subject merchandise, except that,
>> if it is established that a currency transaction on forward markets is directly linked
>> to an export sale under consideration, the exchange rate specified with respect to
>> such currency in the forward sale agreement shall be used to convert the foreign
>> currency.  Fluctuations in exchange rates shall be ignored.

> Commerce appears to argue that it is obligated to follow the express direction of the

statute and ignore fluctuations even if they distort dumping margins in a manner that appears

unfair.  Nevertheless, where there is a fundamental change in the underlying value of the

---

F.2d 1185, 1191 (Fed. Cir. 1990) (acknowledging "the basic purpose of the statute: determining current margins as accurately as possible"); *Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States*, 102 F. Supp. 2d 486, 495 (Ct. Int'l Trade 2000) (stating that "any given methodology must always seek to effectuate the statutory purpose–calculating accurate dumping margins"); *Borlem S.A.-Empreedimentos Industriais v. United States*, 718 F. Supp. 41, 48 (Ct. Int'l Trade 1989) (finding Congress would not authorize "proceedings that are so flawed with inaccurate facts that different results would obtain if accurate facts were used").

[2] The currency conversion elements of the Uruguay Antidumping Agreement must be read within the context of required fair comparisons.  Article 2.4 of the Uruguay Antidumping Agreement requires that "[a] fair comparison shall be made between the export price and the normal value" in dumping determinations.  It subsequently lists the currency conversion requirements also found in 19 U.S.C. § 1677b-1.

United States domestic law echoes the fairness requirement.  In determining whether merchandise "is being or is likely to be, sold at less than fair value, a fair comparison shall be made between the export price or constructed export price and normal value."  19 U.S.C. § 1677b(a).

currency, Commerce is required by its own policy to make an adjustment. In this case, during the

period of review of approximately twelve months the value of the rupee declined an average of

1.1 percent per month. *See Remand Determination* at 4. At the end of the period of review, the

cumulative declination was 14.6 percent. *Id*. Commerce argues that it was appropriate to ignore

the 1.1 percent declination in value on a monthly basis and to ignore the overall 14.6 percent

declination in the value of the rupee during the period of review.

Although Congress clearly intended Commerce to further its goal of accuracy in the

currency conversion process, it did not define all terms of that process. Neither the statute, the

SAA, nor the Uruguay Round Agreements define the term "fluctuations." Because the statute is

silent regarding the meaning of "fluctuations," Commerce appears to have been given discretion

in its approach to the term. The SAA does state the intent that "Commerce will promulgate

regulations implementing the [currency conversion] requirements of section 773A [or 19 U.S.C.

1677b-1]." SAA at 841. Rather than address the meaning of the term "fluctuations" through

regulations, Commerce did so through *Policy Bulletin 96-1*, which creates two versions of the

term–one to be ignored and the other to be acknowledged. *See Notice: Change in Policy*

*Regarding Currency Conversions,* 61 Fed. Reg. 9,434 (Mar. 8, 1996) (*Policy Bulletin 96-1*). An

actual daily rate that varies from the benchmark rate by more than 2.25 percent is treated as a

fluctuation, and an actual daily rate that varies within 2.25 percent from the benchmark rate is

treated as normal. In addition, Commerce recognized that "whenever the decline in the value of

a foreign currency is so precipitous and large as to reasonably preclude the possibility that it is

only fluctuating, the lower actual daily rates will be employed from the time of the large decline."

*Id*. at 9,436. Finally, *Policy Bulletin 96-1* indicates it may be appropriate to use daily rates in

those "situations where the foreign currency depreciates substantially against the dollar over the period of investigation or the period of review." *Id*. at 9,435 n.2.

Commerce has in the past exercised discretion in deciding whether to apply its standard methodology or whether to apply the lower daily rate because the "decline in the value of [the] foreign currency [was] so precipitous and large as to reasonably preclude the possibility that it [was] only fluctuating." *Policy Bulletin 96-1*, 61 Fed. Reg. at 9,436. The won's 40 percent decline over two months in *Stainless Steel from Korea* and the baht's 18 percent drop in one day in *Pipes and Tubes from Thailand* are obvious examples of the precipitous and large declines to which Commerce refers. Commerce, however, declined to define "precipitous and large" in *Policy Bulletin 96-1*, leaving this determination "to be made in future cases." *Certain Welded Carbon Steel Pipes and Tubes from Thailand: Final Results of Antidumping Duty Administrative Review*, 64 Fed. Reg. 56,759, 56,764 (Oct. 21, 1999).

This Court does not suggest that the rupee's gradual change is factually identical to the rapid and large declines in value of the won and baht. However, the rupee's downward movement, while small and gradual, appears cumulatively to have had more than a *de minimis* effect upon Commerce's dumping margin calculations. Here, the lag time between the established date of sale and the receipt of payment, together with the effect of the rupee's devaluation upon imported raw material costs and actual payment received, cause this Court to question whether Commerce's use of its standard methodology in this case falls "within the range of permissible construction of the statute." *Thai Pineapple*, 273 F.3d at 1085. The statute may permit various methodologies, but "it is possible for the application of a particular methodology to be unreasonable in a given case when a more accurate methodology is available

and has been used in similar cases." *Id*. at 1085. This case, although factually distinguishable from *Stainless Steel from Korea* and *Pipes and Tubes from Thailand*, is "no different *in principle* from cases in which Commerce has modified its approach." *Id*. (emphasis added).

In its Remand Order, the Court requested that Commerce explain whether its currency conversion methodology resulted in an accurate dumping margin. Only two statements in the *Remand Determination* appear to comply with this request. The first explains that because of the absence of extraordinary aspects to the observed movement in the rupee, "the record supports the Department's decision to treat the depreciation of the rupee as a fluctuation that could be ignored in a manner consistent with the overriding statutory goal of calculating accurate dumping margins." *Remand Determination* at 5. The second states that "Viraj's [sic] makes an opportunistic claim for the Department to account for rupee depreciation that all agree would lower the calculated dumping margin." *Id*. The first statement is conclusory. The second appears to concede inaccuracy.

This Court therefore remands once again to Commerce to consider whether the application of its standard currency conversion methodology in this case is the most accurate method available to reach a dumping margin undistorted by the rupee's devaluation during the period of review. The Court notes that in the preamble to the final rule Commerce stated, "We agree . . . that we should address depreciating currencies more fully in a final model, and we welcome further suggestions on this point." *Antidumping Duties; Countervailing Duties: Final Rule*, 62 Fed. Reg. 27,296, 27,377 (May 19, 1997). Commerce does not appear to have addressed depreciating currencies more fully, however, and this Court invites Commerce to consider whether the circumstances of this case present an opportunity to do so.

In addition, in response to Plaintiff's argument that Commerce used the exchange rate at purchase order date to determine rupees received by Viraj, but the post-devaluation exchange rate to determine costs, this Court notes that it is not clear from the record whether Commerce used the exchange rate on the date of sale for one part of its calculation and the changed exchange rate for another. If Commerce did apply a different rate for Viraj's costs, this would appear to skew the calculations unfairly to the importer. As part of this remand, the Court therefore directs Commerce to explain if different rates were used, if this was appropriate, and if not appropriate, to make any necessary corrective calculations.

Finally, Commerce has emphasized that the change in the currency exchange rate did not influence Viraj's pricing decisions. Commerce is nevertheless directed to explain where there is a long-term declination in the value of a foreign currency during the period of review by as much as 14.6 percent, how such a long-term substantial declination can be ignored if Commerce is to arrive at an accurate and fair dumping margin and not embrace an absurd result.

## CONCLUSION

Because Commerce failed adequately to explain whether its currency conversion methodology furthers the antidumping statute's requirement of a fair comparison in this dumping determination, and because other more accurate methodologies may exist to do so, this Court remands to Commerce (1) to consider how to apply a currency conversion methodology that best reaches an accurate dumping margin in this case; (2) if necessary, to recalculate Plaintiff's dumping margin using a methodology that furthers the congressional goal of accuracy in dumping determinations; (3) to explain if different currency exchange rates were used in

Commerce's dumping margin calculations, if the use of different rates was appropriate, and if not appropriate, to make any necessary corrective calculations; and (4) to explain the significance of Plaintiff's pricing decisions to Commerce's determination of whether the change in rupee valuation in this case constituted a fluctuation to be ignored.

_____

Gregory W. Carman
Chief Judge

Dated: February 26, 2002
      New York, New York